127 F.3d 1449
 BROWN PARK ESTATES-FAIRFIELD DEVELOPMENT CO., Eden Limited
Partnership, Parish Square Apartments, Pine Hill
Estates Limited Partnership, Stone Vista
Apartments, Plaintiffs-Appellants,
v.
The UNITED STATES, Defendant-Appellee.
 No. 96-5103.
 United States Court of Appeals,
Federal Circuit.
 Oct. 21, 1997.
 
 Harry J. Kelly III, Peabody & Brown, Washington, DC, argued for plaintiffs-appellants. With him on the brief was Charles L. Edson.
 Sharon Y. Eubanks, Deputy Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued for defendant-appellee. On the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and John E. Kosloske, Senior Trial Counsel.
 Before SCHALL, Circuit Judge, SMITH, Senior Circuit Judge, and BRYSON, Circuit Judge.
 SCHALL, Circuit Judge.
 
 
 1
 This case involves claims arising under the so-called "Section 8" housing program. Plaintiffs-Appellants Brown Park Estates--Fairfield Development Company ("Brown Park Estates"), Eden Limited Partnership ("Eden"), Parish Square Apartments ("Parish Square"), Pine Hill Estates Limited Partnership ("Pine Hill"), and Stone Vista Apartments--Fairfield Property Management ("Stone Vista") (collectively "appellants") appeal the November 29, 1995 decision of the United States Court of Federal Claims in Brown Park Estates-Fairfield Development Co. v. United States, 34 Fed. Cl. 464 (1995). Except for one claim asserted by Eden, the court dismissed appellants' Section 8 claims as barred by the applicable statute of limitations, 28 U.S.C. § 2501 (1994).[1] In addition, the court concluded that Stone Vista lacked privity of contract with the United States. It therefore held that it lacked jurisdiction to entertain Stone Vista's claims.[2] Because we conclude that all of the claims at issue are barred by the statute of limitations, we affirm.
 
 BACKGROUND
 I.
 
 2
 In 1974, Congress enacted Section 8 as part of section 201(a) of the Housing and Community Development Act of 1974, Pub.L. No. 93-383, 88 Stat. 633, 653-67 (1974). In so doing, Congress amended the United States Housing Act of 1937 (codified as amended at 42 U.S.C. § 1437f (1994)). Section 8 created a housing assistance program "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing...." 42 U.S.C. § 1437f(a) (1994). Under the program, the United States, acting through the Department of Housing and Urban Development ("HUD"), subsidizes the rents of low-income individuals and families who live in privately-owned dwelling units.[3] These subsidies are generally provided in one of two ways: (i) HUD enters into a Housing Assistance Payments ("HAP") contract directly with an owner of the dwelling units, see 42 U.S.C. § 1437f(a) (1994), or (ii) HUD enters into an "annual contributions contract" ("ACC") with a "public housing agency" ("PHA"), 42 U.S.C. § 1437f(b) (1994).[4] In the latter case, subject to HUD's approval, the PHA in turn enters into a HAP contract with the owner. Id.; see National Leased Hous. Ass'n v. United States, 105 F.3d 1423, 1425 (Fed.Cir.1997).
 
 
 3
 HAP contracts specify maximum monthly rents for the dwelling units being subsidized--known as "contract rents"--which the owner is entitled to receive for each dwelling unit for which rental assistance payments are to be made. 42 U.S.C. § 1437f(c)(1) (1994); 24 C.F.R. § 880.201 (1996). Of this contract rent, the tenant is responsible for paying a specified amount based on his or her income, known as the tenant rent. See 42 U.S.C. § 1437a(a) (1994); 24 C.F.R. § 880.201. The remaining portion of the contract rent--which is the amount of the rental assistance--is paid by the governmental entity (either HUD or the local PHA) contracting with the owner. 42 U.S.C. § 1437f(c)(3)(A) (1994); 24 C.F.R. § 880.501(d)(1) (1996).
 
 
 4
 The contract rent is initially set by HUD to approximate the fair market value of the rental property for the local area, taking into account certain adjustments to reflect additional costs associated with complying with Section 8 requirements. See generally National Leased Hous., 105 F.3d at 1425. In addition to setting initial contract rents, HUD is responsible for adjusting the contract rents on at least an annual basis. Section 8(c)(2)(A) provides in pertinent part:
 
 
 5
 The [HAP] contract shall provide for adjustment annually or more frequently in the maximum monthly rents for units covered by the contract to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula.
 
 
 6
 42 U.S.C. § 1437f(c)(2)(A) (1994).
 
 II.
 
 7
 Appellants are owners of various rental apartment properties in the state of Louisiana. From 1978 through 1991, they entered into HAP contracts. All of the appellants except Stone Vista contracted directly with HUD. Stone Vista entered into a HAP contract with a local PHA, the Housing Authority of the City of Shreveport, which in turn entered into an ACC contract with HUD.[5] Appellants' claims grow out of the rent adjustment provisions of their contracts.
 
 
 8
 The HAP contracts in this case contained specific provisions implementing the statutory mandate relating to rent adjustments. Two versions of HAP contracts were utilized. A 1976 version was used for Pine Hill's HAP contract with HUD, while a 1980 version was used for each of the remaining contracts. The 1976 version HAP contract contained Section 1.8b on rent adjustments, which stated:
 
 
 9
 (b) Automatic Annual Adjustments
 
 
 10
 (1) Automatic Annual Adjustment Factors will be determined by the Government at least annually[6]; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.
 
 
 11
 (2) On each anniversary date of the Contract, the Contract rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.
 
 
 12
 The 1980 version HAP contracts contained Section 2.7(b) on rent adjustments, which read:
 
 
 13
 (b) Annual Adjustments.
 
 
 14
 (1) Upon request from the Owner to the [Contract Administrator],[7] Contract Rents will be adjusted on the anniversary date of the Contract in accordance with 24 CFR 888[8] and this Contract. See, however, paragraph (d).
 
 
 15
 Contract rent adjustments are subject to certain limitations. Section 8(c)(2)(C) provides in pertinent part that "[a]djustments in the maximum rents ... shall not result in material differences between the rents charged for assisted units and unassisted units of similar quality, type, and age in the same market area, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(C) (1994).[9] To implement this statutory provision, the 1976 version HAP contracts contained Section 1.8d, which stated:
 
 
 16
 Overall Limitation. Not withstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.
 
 
 17
 The 1980 version contained similar language, found in section 2.7(d):
 
 
 18
 Overall Limitation. Notwithstanding any other provision of this Contract, adjustments after Contract execution or cost certification, where applicable, shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by HUD; except to the extent that the differences existed with respect to the Contract Rents set at Contract execution or cost certification, where applicable.
 
 III.
 
 19
 At various times during the years 1986-1988 and 1991, HUD allegedly failed to make rent adjustments in accordance with the AAAF (or AAF) provisions of appellants' HAP contracts. On October 28, 1994, appellants brought suit in the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491 (1994), alleging that HUD had breached their contracts because of its failure to make the proper rent adjustments, and that as a result of this breach, they had suffered total damages of $698,874. In their complaint, appellants introduced their main contention as "HUD has breached its contracts with the Plaintiffs because, in the absence of any comparability studies, it failed to pay full rental adjustments based on the AAFs." Complaint, p 2. After providing relevant background facts on Section 8 programs, appellants averred:
 
 
 20
 Thus, under the governing laws, regulations and contracts, the Plaintiffs are entitled to receive rental adjustments, based either on studies of rents at comparable housing or, in the absence of any such studies, on the basis of the AAFs. In the case of each of the Projects, however, HUD failed either to prepare comparability studies or to make rent adjustments based on the AAFs. As the following Project-by-Project analysis shows, the Plaintiffs have not received rent increases to which they are entitled. The Plaintiffs seek damages to recover the portion of those unpaid rent increases to which they are entitled.
 
 
 21
 Complaint, p 14.
 
 
 22
 Following this general allegation, appellants further alleged for each individual plaintiff that: (i) at specified times, HUD "failed to pay the full AAF-based rent adjustment in the absence of a comparability study"; and (ii) while the plaintiff received subsequent rent adjustments, such later adjustments were understated because they were based on rents lower than what should have been allowed had HUD made the proper rent adjustment at the specified time. Appellants also alleged the specific amounts of such understatements for each subsequent year and asserted that, because no comparability studies were performed, HUD "was obliged under the [Section 8] Program to make rent adjustments under the full AAF." Finally, for each individual plaintiff, it was alleged that "HUD's failure to pay the full AAF-based adjustment resulted in a deficiency of rent adjustments" in a total specified amount. See Complaint, pp 15-53.
 
 
 23
 The specified times at which HUD allegedly failed to make the proper rent adjustments were as follows: (i) for Brown Park Estates--November of 1987, (ii) for Eden--February of 1987, 1988, and 1991, (iii) for Parish Square--December of 1986 and 1987, (iv) for Pine Hill--June of 1986 and 1987, and (v) for Stone Vista--January of 1987. Appellants further alleged that, while the amounts of the understatements were partially paid by the government under section 801 of the Department of Housing and Urban Renewal Reform Act of 1989, Pub.L. No. 101-235, 103 Stat. 1987, 2057 (1989) (codified at 42 U.S.C. § 1437f),[10] a total deficiency of $698,874 remained unpaid.
 
 
 24
 In due course, the government moved to dismiss the complaint on the ground that appellants' claims had accrued more than six years prior to the filing of the complaint and therefore were barred under the applicable statute of limitations, 28 U.S.C. § 2501 (1994). The government further asserted that, in addition to its claims being barred by the applicable statute of limitations, Stone Vista lacked privity of contract with the United States; therefore, the court lacked subject matter jurisdiction to hear its claim.
 
 
 25
 In opposing the motion to dismiss, appellants asserted that their claims were covered under the "continuing claim" doctrine, and therefore were not barred by the statute of limitations. As far as Stone Vista was concerned, appellants asserted that there was not a lack of privity with the United States.
 
 
 26
 Addressing the motion to dismiss, the Court of Federal Claims concluded that all of appellants' claims, except for Eden's claim that HUD failed to make the proper rent adjustment in February of 1991, were barred by the statute of limitations. Brown Park, 34 Fed. Cl. at 467-68. The court rejected the argument that the continuing claim doctrine was applicable. Id. at 467. Citing a test for the continuing claim doctrine from Polite v. United States, 24 Cl.Ct. 508 (1991), the court stated: "First, the subject matter of the claim must not be one which Congress has entrusted to an administrative officer or tribunal for a determination of claimant's eligibility for the pay sought. Second, the case should involve narrow factual issues and should not involve the exercise of expertise and discretion." Brown Park, 34 Fed. Cl. at 466 (quoting Polite, 24 Cl.Ct. at 510). The Court of Federal Claims determined that appellants' claims satisfied neither of these conditions:
 
 
 27
 Plaintiffs' claims do not satisfy the two characteristics necessary to fall within the doctrine's scope. The first prong requires that the subject matter of the claim be one which has not been "entrusted to an administrative officer." Here, however, under the Section 8 statute as well as the HAP Contracts, rent adjustment determinations are clearly delegated to HUD....
 
 
 28
 Plaintiffs' claims also fail to meet the second prong of the continuing claim doctrine. The determination of plaintiffs' rent adjustments by HUD involved comparative studies of assisted and unassisted housing in a given market area. Such rent comparability determinations involved "the exercise of expertise and discretion," which further violates the continuing claim doctrine.
 
 
 29
 Id. at 467 (citations omitted).
 
 
 30
 In addition, the court concluded that it lacked subject matter jurisdiction to hear Stone Vista's claim because Stone Vista was not in privity with the United States. Id. at 467. The court determined that HUD's close supervision of Stone Vista's HAP contract with the Shreveport Housing Authority was insufficient to establish privity. Accordingly, the court ordered that appellants' complaint be dismissed. Id. at 467-68. This appeal followed.
 
 DISCUSSION
 I.
 
 31
 The statute of limitations in 28 U.S.C. § 2501 (1994) is an express limitation on the Tucker Act's waiver of sovereign immunity. Hart v. United States, 910 F.2d 815, 817 (Fed.Cir.1990) (citing Soriano v. United States, 352 U.S. 270, 273-74, 77 S.Ct. 269, 271-72, 1 L.Ed.2d 306 (1957)). In that regard, we have stated that section 2501 "is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed.Cir.1988); see Bath Iron Works Corp. v. United States, 20 F.3d 1567, 1572 (Fed.Cir.1994). In addition, the Supreme Court has stated that "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in the statutory text.... Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." Lane v. Pena, 518 U.S. 187, ----, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996); see United States v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 953-54, 47 L.Ed.2d 114 (1976). Jurisdiction is a question of law that we review de novo. Hamlet v. United States, 63 F.3d 1097, 1101 (Fed.Cir.1995).
 
 
 32
 Appellants argue that the Court of Federal Claims erred in concluding that their claims were barred by the statute of limitations, and that Stone Vista was not in privity with the United States. Regarding the statute of limitations issue, appellants contend that HUD's failure to make the proper rent adjustments at the specified times between June of 1986 and February of 1988 constituted a breach of their HAP contracts. This breach, appellants argue, resulted in damages to appellants, not only during those years in which the alleged breach originally occurred,[11] but also in subsequent years, including the six years prior to suit (October 28, 1988 to October 28, 1994). As they did before the Court of Federal Claims, appellants seek to ward off the bar of the statute of limitations by relying on the continuing claim doctrine. Appellants urge that HUD was under a continuing duty to make periodic payments to them, and that its alleged failure to make required rent adjustments at specified times during the period from June of 1986 to February of 1988 meant that when HUD made rent adjustments in subsequent years (including the six years preceding the filing of suit), these later adjustments were calculated according to a lower basis than they should have been. Thus, appellants state:
 
 
 33
 [T]he Government here indisputably committed acts prior to the six-year limitations period that have reverberated ever since. Any failure to pay one year's Section 8 rent adjustment will reduce the basis upon which subsequent adjustments are calculated. Thus, whenever a rent subsidy is paid today, HUD is paying a smaller amount than would be due if the rent had been adjusted properly earlier. Over the years, the gap between the amount received by the Owners, and the amount they would have received, if the correct rent adjustments had been made, has widened. It is this difference that HUD has each year failed to pay, which constitutes a continuing claim against HUD, that Owners now seek to recoup.
 
 
 34
 For the reasons which follow, we hold that the continuing claim doctrine does not apply to appellants' claims. The claims all accrued before the six years preceding filing of suit; therefore, they are barred by the statute of limitations, and the Court of Federal Claims lacked jurisdiction. We do not reach the privity issue.
 
 II.
 
 35
 Section 2501 provides in pertinent part that: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (1994). A claim first accrues within the meaning of the statute of limitations "when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Brighton Village Assocs. v. United States, 52 F.3d 1056, 1060 (Fed.Cir.1995) (quoting Kinsey v. United States, 852 F.2d 556, 557 (Fed.Cir.1988)); see Hopland Band of Pomo Indians, 855 F.2d at 1577. Under this standard, appellants' claims based upon HUD's alleged breach of the several HAP contracts accrued, with respect to each contract, when HUD allegedly failed to make the proper rent adjustment, i.e., at each of the various times between June of 1986 and February of 1988. At each of these specific points in time, the government's liability was fixed and appellants were entitled to institute an action. Therefore, because appellants did not file their complaint until October 28, 1994--over six years after HUD's alleged breaches of their HAP contracts--on its face the statute of limitations bars their claims.[12]
 
 
 36
 However, we must decide whether appellants' claims survive--at least the portion of the claims resting in the six years preceding filing of suit--by virtue of the continuing claim doctrine. In Friedman v. United States, 159 Ct.Cl. 1, 310 F.2d 381 (1962), the Court of Claims explained the doctrine:
 
 
 37
 Over the years, the court's pay cases (military and civilian) concerned with the issue of limitations have often applied the so-called 'continuing claim' theory, i.e., periodic pay claims arising more than six years prior to suit are barred, but not those arising within the six-year span even though the administrative refusal to pay the sum claimed may have occurred, or the statute on which the claim is grounded may have been enacted, prior to six years. These were suits for additional pay at a higher grade, or claiming greater compensation (under a statute or regulation) than the claimant was receiving, or seeking special statutory increments or allowances, etc. The important characteristics of all these cases were: (a) Congress had not entrusted an administrative officer or tribunal with the determination of the claimant's eligibility for the particular pay he sought; (b) the cases turned on pure issues of law or on specific issues of fact which the court was to decide for itself (i.e., Congress had not established any administrative tribunal to decide either the factual or the legal questions); and (c) in general the cases called upon the court to resolve sharp and narrow factual issues not demanding judicial evaluation of broad concepts such as 'disability' (concepts which involve the weighing of numerous factors and considerations as well as the exercise of expertise and discretion).
 
 
 38
 Id. at 384-85. The court went on to state that "where the payments are to be made periodically, each successive failure to make proper payment gives rise to a new claim upon which suit can be brought." Id. at 385. Accord Batten v. United States, 220 Ct.Cl. 327, 597 F.2d 1385, 1387 n. 10 (1979); Bruno v. United States, 214 Ct.Cl. 383, 556 F.2d 1104, 1106 (1977); Burich v. United States, 177 Ct.Cl. 139, 366 F.2d 984, 986 (1966); see also Beebe v. United States, 226 Ct.Cl. 308, 640 F.2d 1283, 1293 (1981).
 
 
 39
 In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages. Thus, the Friedman court referred to "periodic pay claims ... arising within the six-year span" of the statute of limitations as not being barred by the statute of limitations. Friedman, 310 F.2d at 384. Each time such a periodic claim for pay arose and the plaintiff was not paid, the government allegedly committed a distinct wrong. Such was the case, for example, in Burich v. United States, supra, where the plaintiff worked overtime hours over a period of years, for which he was paid certain premium payments. Burich, 366 F.2d at 986. The plaintiff alleged that he was entitled to hourly computed overtime rather than the premium payments he had received. Id. Because compensation was due and payable periodically, a claim arose each time the government allegedly failed to pay the proper amount of overtime pay. See id. at 986-87; see also Batten, 597 F.2d at 1387 n. 10 (in assessing plaintiffs' claim that they should have received pay at a higher wage than they were paid for a given period of time, the court stated that "[a] claim for periodic installments of back pay allegedly due is a continuing claim involving multiple causes of action, each one arising at the time the Government fails to make the payment alleged to be due."); Beebe, 640 F.2d at 1293 (in a suit for compensation of overtime pay, the court noted that a separate cause of action accrued each time overtime compensation was excluded from plaintiffs' pay).
 
 
 40
 However, a claim based upon a single distinct event, which may have continued ill effects later on, is not a continuing claim. In Hart v. United States, supra, an Air Force sergeant retired from the military and elected not to participate in a survivor benefit plan. 910 F.2d at 816. Over six years after his death, his widow sued the government under the Tucker Act in the United States Claims Court, the predecessor of the Court of Federal Claims, seeking annuity benefits allegedly due her since the date of her husband's death. Id. She claimed that the government had violated a statute that required the government to notify her of her husband's election not to participate in the survivor plan. Id. at 816-17. The government moved to dismiss the complaint, arguing that the claim was barred by the statute of limitations. The Claims Court denied the motion, holding that the claim for survivor benefits was a continuing claim and that, therefore, the claim for such benefits accruing within six years of the time suit was filed was not time barred. Id. at 817. Accordingly, the court granted summary judgment for the plaintiff. Hart, 910 F.2d at 817. On appeal by the government, we held that the plaintiff's claim for compensation accrued the day of her husband's death, and because she filed suit over six years after that date, her claim was barred by the statute of limitations, 28 U.S.C. § 2501. Id. at 818. We rejected the plaintiff's argument that she had a continuing claim, where a new claim accrued each time she was to be paid under the annuity. We stated that "[b]ecause all events necessary to her benefits claim had occurred when her husband died, we conclude that plaintiff's claim for ... annuity benefits is not a 'continuing' claim." Id.
 
 
 41
 Similarly, in Lane v. United States, 208 Ct.Cl. 955 (1975), the plaintiff brought a Tucker Act suit in the Court of Claims, alleging that he was illegally discharged from the Army and seeking active duty pay from the date of discharge. Id. at 955. The plaintiff initiated his action well over six years after his alleged illegal discharge. Id. In dismissing the claim as barred by the statute of limitations, the Court of Claims rejected plaintiff's attempt to classify his claim as a continuing claim. See Lane, 208 Ct.Cl. 955-56. The court held that the plaintiff's claim "accrue[d] all at once" upon his removal, and that he had had six years from that date to bring suit, which he had not done. Id.
 
 
 42
 In each of the above cases in which a continuing claim was found--Friedman, Burich, Batten, and Beebe--the plaintiff's claim could be broken down into a series of independent and distinct wrongs or events, each such wrong or event having its own associated damages. Each wrong constituted an alleged violation of a statute or regulation that accrued when that particular wrong occurred, independent of the accrual of other wrongs. For example, in Burich, each failure by the government to make overtime payments to the plaintiff after overtime work was performed constituted a separate alleged violation of the applicable statute that accrued at that point in time, and was independent of the accrual of actions for other nonpayments of overtime. On the other hand, in the second set of cases--Hart and Lane--the plaintiffs really only pointed to one alleged wrong by the government, which accrued all at once at one point in time, even though it may have had later adverse effects. The plaintiffs' alleged later "wrongs," such as nonpayment of annuities or wages, were not independently accruing violations of any statutes or regulations in themselves, but rather were merely damages resulting from the single earlier alleged violation by the government--such as lack of notification or wrongful discharge--that accrued outside the statute of limitations period.
 
 
 43
 The present case does not involve a series of independent, distinct wrongs. Contrary to appellants' contentions, the government's alleged breaches were not continuing in nature. As is clear from the complaint in the Court of Federal Claims and from the statement from appellants' brief in this appeal that is quoted above, appellants are not complaining about any alleged breaches of the HAP contracts by HUD during the six-year period immediately prior to the filing of suit. Appellants' claims are based on HUD's alleged failure to make the proper rent adjustments at the specified times between June of 1986 and February of 1988. That failure, and the consequential damages resulting from it, constitute the actionable wrong that appellants seek to vindicate. As far as the six years prior to filing suit are concerned, appellants do not contend that HUD failed to make rent adjustments during those years. Rather, they argue that on account of HUD's breaches outside the period of the statute of limitations, HUD started from the wrong base when making rent adjustments during the six years prior to the filing of suit. Thus, the alleged improper base for these latter years relates directly to, and is completely dependent on, whether HUD failed to make rent adjustments in earlier years in violation of the HAP contracts.
 
 
 44
 Appellants argue, nevertheless, that application of the continuing claim doctrine in this case is supported by the decision of the Court of Claims in Aktiebolaget Bofors v. United States, 139 Ct.Cl. 642, 153 F.Supp. 397 (1957), and by the decision of the Claims Court in Mitchell v. United States, 10 Cl.Ct. 63 (1986), opinion on reconsideration, 10 Cl.Ct. 787 (1986). We disagree.
 
 
 45
 In the first case, Aktiebolaget Bofors ("Bofors") entered into a license agreement with the United States, under which the United States was permitted to make, use, or have made a certain type of anti-aircraft gun which Bofors had developed. Aktiebolaget Bofors, 153 F.Supp. at 398-99. The agreement contained a provision prohibiting the United States from exporting such guns to other countries. Id. Allegedly, shortly after entering into the agreement in 1941, and continuing for a number of years thereafter, the United States exported the Bofors guns to other countries in violation of the agreement. Id. at 399. Bofors brought suit in 1953, alleging breach of the agreement. Id. In response to the government's argument that the action was barred by section 2501, the court stated that "each act of violation, whenever it occurred, would constitute a violation of the agreement." Aktiebolaget Bofors, 153 F.Supp. at 399. Thus, Bofors was not barred from bringing suit for alleged violations of the license agreement occurring within the six year period before its suit was filed. Id. at 400.
 
 
 46
 In Mitchell, the plaintiffs--allottees of land on an Indian reservation--sued the government to recover damages allegedly arising from the mismanagement of their timber resources. 10 Cl.Ct. at 65. The plaintiffs claimed that the Secretary of the Interior, acting through the Bureau of Indian Affairs ("BIA"), had failed to properly discharge his duties under federal statutes that assigned to him various responsibilities with respect to the timber. Id. The government moved to dismiss for lack of timeliness those portions of the plaintiffs' claims that it contended involved events occurring more than six years prior to the commencement of the suit.
 
 
 47
 The focus of the limitations issue was on the plaintiffs' stumpage and regeneration claims. The basis for the stumpage claims was the allegation that the BIA had sold the plaintiffs' timber at inadequate prices. Id. at 77. In their regeneration claims, the plaintiffs alleged that the BIA had failed to restock those portions of the timber allotments that had been cut or burned over. Id. As far as the stumpage claims were concerned, the Claims Court determined that "each such sale of a portion of timber generated a new and separate cause of action." Mitchell, 10 Cl.Ct. at 77. Accordingly, the plaintiffs could attempt to recover damages resulting from any timber sales in the six-year period before the filing of suit. Id.
 
 
 48
 Turning to the regeneration claims, the court concluded that the BIA had a continuing duty to maintain the tracts of timberland in a state of productivity. See Mitchell, 10 Cl.Ct. at 788. The court viewed an ongoing breach of this "continuing duty as creating a series of individual actionable wrongs." Id. According to the court, "the existence of a continuing duty to regenerate mean[t] that on each day the BIA failed in its duty to regenerate a given [area], there arose a new cause of action." Id. The court concluded that "those causes of action which arose in the six-year limitations period may be sued upon." Id. The court stated: "[I]f the BIA allowed a particular tract to remain unproductive for decades, plaintiffs' claim regarding that tract is not forever lost. Rather, plaintiffs can sue for damages stemming from those breaches which occurred in the six years immediately preceding the filing of suit." Mitchell, 10 Cl.Ct. at 788. Finally, the court contrasted the BIA's obligations respecting regeneration and stumpage. Because the duty to replant was an ever-present one, "the non-performance of the duty [was] properly viewed as giving rise to a series of actionable breaches." Id. at 789. The duty to obtain adequate timber prices, however, arose at a specific point in time, namely, when the timber was sold. "The purported wrong [occurred] at that [specific point], and the subsequent failure to make plaintiffs whole is not a continuation of the original wrong, but merely a continuing effect of that wrong." Id. Thus, the Claims Court ruled that the plaintiffs could not pursue their stumpage claims with respect to timber harvested before the six-year limitations period, but that they could go forward with regeneration claims with respect to those harvests. Id.
 
 
 49
 Neither Bofors nor Mitchell helps appellants. Each of those cases involved individual actionable wrongs--in Bofors, separate and distinct breaches of contract; in Mitchell, separate and distinct breaches of statutory duties. In both cases, each such breach gave rise to a claim for which suit had to be brought within the six-year limitations period. The alleged breaches by the government in this case occurred at the specified times between June of 1986 and February of 1988 when HUD failed to make rent adjustments under each of the five HAP contracts, thereby resulting in allegedly erroneous contract rents. According to appellants, HUD made rent adjustments in subsequent years that depended on the allegedly erroneous contract rents and therefore were incorrect. Thus, as noted above, it is HUD's failure to make rent adjustments at the specified times between June of 1986 and February of 1988, and the consequential damages resulting from that failure, that constitute the actionable wrong that appellants seek to vindicate. This is not a case of recurring, individual actionable wrongs. Claims arising from HUD's failure to make rent adjustments in earlier years--between June of 1986 and February of 1988--accrued when each such failure occurred, just as each claim in Bofors and Mitchell accrued when the applicable individual actionable wrong occurred. Appellants' claims against HUD are now barred by section 2501 and cannot be revived under the continuing claim doctrine.[13]
 
 CONCLUSION
 
 50
 For the foregoing reasons, the Court of Federal Claims correctly decided that plaintiffs' claims were barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501.[14]
 
 COSTS
 
 51
 Each party shall bear its own costs.
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 We refer to the most recent versions of the statutes and regulations, unless a substantive change has been made to the cited provision after the events giving rise to this case
 
 
 [2]
 Following the court's decision, the government and Eden settled the one claim not dismissed by the court. Thereafter, pursuant to stipulation of the parties, judgment was entered in favor of Eden and dismissing the remainder of appellants' claims in accordance with the court's November 29 decision
 
 
 [3]
 HUD operates the Section 8 assistance program through its implementing regulations, found generally at 24 C.F.R. Chapters VII and VIII
 
 
 [4]
 A "public housing agency" is defined as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of low-income housing." 42 U.S.C. § 1437a(b)(6) (1994)
 
 
 [5]
 Brown Park Estates entered into a HAP contract with HUD in October of 1980. Eden and Parish Square Apartments did so in January and December of 1981, respectively. Pine Hill entered into a HAP contract with HUD in May of 1978. Stone Vista entered into its contract with the Shreveport PHA in December of 1980
 
 
 [6]
 Under the Automatic Annual Adjustment Factor ("AAAF") method of adjusting contract rents, the existing contract rent is multiplied by some designated factor to obtain the following year's contract rent. Thus, the contract rent of Year 2 is directly based on the contract rent of Year 1
 
 
 [7]
 The Contract Administrator is defined in the regulations as "[t]he entity which enters into the [HAP contract] with the owner and is responsible for monitoring performance by the owner." 24 C.F.R. § 880.201 (1996). Thus, the "contract administrator is a PHA in the case of private-owner/PHA projects, and HUD in private-owner/HUD and PHA-owner/HUD projects." Id
 
 
 [8]
 Sections 888.201-.204 provide an adjustment formula based on annual adjustment factors ("AAFs"), factors which are published by the government and track the AAAFs used in the 1976 version, except that they are applied upon request of the owner, not automatically
 
 
 [9]
 The statutory provision in effect at the time of the contracts at issue provided that rent adjustments could not result in "material differences between the rents charged for assisted and comparable unassisted units." 42 U.S.C. § 1437f(c)(2)(C) (1982). In 1988, Congress amended the provision to replace "assisted and unassisted comparable units" with "assisted units and unassisted units of similar quality and age in the same market area," Pub.L. No. 100-242, § 142(c)(2)(A), 101 Stat. 1815, 1850 (1988), and amended it to its present form in 1989, Pub.L. No. 101-235, § 801(g), 103 Stat. 1987, 2059 (1989)
 
 
 [10]
 Section 801 provides for, inter alia, limited damages for owners whose contract rents were reduced in the past due to the use of comparability studies. See National Leased Hous., 105 F.3d at 1427. Though no comparability studies were actually performed in this case, no question has been raised as to whether appellants correctly received funds pursuant to this section
 
 
 [11]
 Appellants make no claim for these asserted damages, as they are plainly outside the six year period before filing suit and therefore barred by the statute of limitations
 
 
 [12]
 Such an application of section 2501 is illustrated in Brighton Village Assocs., 52 F.3d at 1060
 
 
 [13]
 Based on our conclusion that appellants have not asserted a continuing claim, we do not need to address whether appellants would have met the Friedman conditions for applying the continuing claim doctrine
 
 
 [14]
 At oral argument, an issue was raised as to whether it could be argued that HUD breached the contracts during the six years preceding the filing of suit because, during those years, material differences may have existed between the rents charged for assisted and comparable unassisted units, in violation of provisions 1.8d (1976 version) and 2.7(d) (1980 version) of the HAP contracts, both quoted above. We do not address that issue. As can be seen, appellants did not raise the issue before the Court of Federal Claims. In that regard, we need not consider issues not presented to the trial court. Braun, Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 821 (Fed.Cir.1992); Shearin v. United States, 992 F.2d 1195, 1197 (Fed.Cir.1993); Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976)
 In any event, appellants abandoned the issue when they argued before this court that they satisfied the Friedman condition that the case involve narrow factual issues and not the exercise of expertise and discretion. They did so by stating that, because HUD did not perform any comparability studies, and "since comparability studies were only performed where the AAF-adjusted rents resulted in rents that materially exceeded comparable unassisted rents, HUD had no reason to perform any such studies." (emphasis added). It is also significant that appellants' prayer for relief was for damages equal to the difference between the actual rent amounts they were paid (plus the amounts paid under section 801 of the Department of Housing and Urban Renewal Reform Act of 1989) and the rent amounts that would have been paid had the adjustment factors (not comparability studies) been applied. See Complaint, pp 22, 30, 38, 45, and 53. By arguing that HUD had no reason to perform comparability studies, appellants admitted that the AAF-adjusted rents were not materially different from those of comparable unassisted units. Therefore, they cannot plausibly contend that HUD breached the contracts because of a material difference between rents charged for assisted and comparable unassisted units.