Errol BROWN, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 91–898L.

United States Court of Federal Claims.

Dec. 8, 1998.

Richard W. Hughes, Santa Fe, New Mexico, attorney of record for plaintiffs.

Glen R. Goodsell, Washington, DC, with whom was Assistant Attorney General Lois J. Schiffer, for defendant.

## OPINION

REGINALD W. GIBSON, Senior Judge.

### INTRODUCTION

American Indians, plaintiffs herein, are suing the United States government for alleged breach of fiduciary duties that arise from the government's statutory and regulatory trust responsibilities over Indian land. Plaintiffs leased their property to a golf course operator through a long-term lease with an option to renew. In their complaint, the Indian lessors allege that the government mismanaged this lease in connection with various breaches of its fiduciary duties, resulting in the loss of rents. In its first decision, issued on December 28, 1994, this court dismissed this case, holding that the statute governing long-term leases of Indian lands did not create a trust relationship in the government over long-term leases, and thus, the lessors could not pursue a breach of trust claim. *Brown v. United States*, 32 Fed.Cl. 509 (1994). The Court of Appeals for the Federal Circuit (CAFC) reversed, finding that the long-term leasing statute did in fact create a fiduciary duty on the government; however, the CAFC limited the scope of such duties strictly to those placed on the government by statute or regulation. *Brown v. United States*, 86 F.3d 1554 (Fed.Cir.1996). On remand, this court must now consider the following three issues: (i) whether the lessors' five (5) claims are barred by the statute of limitations; (ii) whether each of the lessors' five (5) claims state a claim upon which relief may be granted; and (iii) whether the lessors have failed to join an indispensable party. In that connection, we must, of course, address the government's several motions to dismiss raising the foregoing issues.

### FACTS

Plaintiffs are members of the Salt River Pima–Maricopa Indian Reservation near

Phoenix, Arizona. In June of 1964, they, or their predecessors in interest, were among 16 American Indians who leased 160 acres of their land for use as a golf course. To understand the manner in which this lease was administered, we must first review the laws affecting control over Indian landholds.

The land in question was allotted to the lessors' predecessors under the Indian Allotment Act of 1877. Act of Feb. 8, 1877, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331–34, 339, 341–42, 348–49, 354, and 381). Such original allottees received thereunder a beneficial interest in 10 acres of irrigable land, with the legal title held in trust by the government. The Indians were prohibited, however, from either alienating or partitioning their interest. 25 U.S.C. §§ 177 and 348. As Phoenix and its satellite cities grew around the aforesaid Reservation, the Indians' land became a noticeable island of undeveloped real estate.

Some relief from the foregoing restrictions came in 1955, when Congress passed the Indian Long–Term Leasing Act, permitting Indians to commit their lands to long-term leases, for "business purposes," subject to the approval of the Secretary of the Interior (Secretary). 25 U.S.C. §§ 415, 415a to 415d (1996).[1] This Act allowed Indians to realize the ultimate commercial potential from their land. The logistics of approving the leases were directly handled by the Bureau of Indian Affairs (BIA) by delegation from the Department of Interior.

In accordance with their powers under the Long–Term Leasing Act, the plaintiff-lessors executed the present lease, to begin on July 1, 1964, and extending through June 30, 1989, with an option to renew for another 25–year term. As of 1991, the year in which this suit was filed, the participating lessors numbered near 80 due to fractionation—the increasing of undivided interests in an allotment due to devise and descent. Although the lessee at the time of the lease signing was Stover's, Inc., the lessee at the center of the present controversy is Pima Country Club (Pima). Under the terms of the lease, the total rental

payment consisted of two parts—a ground rental and a percentage rental. Ground rental was a fixed payment every quarter for the 25–year term. The percentage rental payment was to commence in 1966, two years after the start of the lease, and initially was 2% of the lessee's "gross receipts." Lease ¶ 14(d). Four years after the start of the lease, the percentage rental increased to 4% of "gross receipts." *Id.* Such gross receipts under the lease included *all* receipts from sales and services performed on the premises, and specifically included green fees, cart rentals, club storage fees, driving range fees, golf membership fees, pro shop sales, charges for food and beverages, and rentals from the existing house on the premises. As a further condition, the lessees were to submit, along with the percentage rental payment, a certified statement of "gross receipts from business conducted on the leased premises" for the previous quarter. Lease ¶ 14(d)(5). The certified statement of receipts was to be sent both to the lessors and to the Secretary. Finally, this certified statement of receipts was to be prepared by a C.P.A. licensed in Arizona.

Another provision of the lease was a standard clause found in all form leases, which was substantially adopted from the regulations governing long-term leases, specifically 25 C.F.R. § 162.8. The lease states the following:

> The rental provisions in all leases which are granted for a term of more than five years and which are not based primarily on percentages of income produced by the land shall be subject to review and adjustment by the Secretary at not less than five-year intervals.... Such review shall give consideration to the economic conditions at the time, exclusive of improvement or development required by this contract or the contribution value of such improvements.

Lease ¶ 7. The foregoing language essentially recapitulates the statutory duty of the Secretary found in 25 C.F.R. § 162.8 to review and adjust leases at five-year intervals.

1. Section 415 provides, in pertinent part, that: "Any restricted Indian lands, whether tribally or individually owned, may be leased by the Indian

owners, with the approval of the Secretary of the Interior, for public, religious, educational, recreational, residential, or business purposes...."

Additional rental provisions included a requirement that the lessee allow accounting agents of the lessor and representatives of the government to have access to all of the lessee's documents and books relating to the lease. Another provision gave the lessee an option to renew the lease for an additional 25–year term, if the lessee was not in default on the lease as of the expiration date of June 30, 1989. Finally, insurance was required on all buildings and improvements to the premises, and the insurance policy was to be deposited with the Secretary.

There were few problems during the first years of the lease. In 1971, however, the lessors and the BIA received notice of a foreclosure by a bank against the then-lessee. One year later, in 1972, the lessee was acquired and after various name changes, Pima became the named lessee.

The government's management of the lease on behalf of the lessors changed in 1975, when the Salt River Pima–Maricopa Indian Community (Tribe) contracted with the BIA to take over management of all leases on the reservation. This contract was spurred by passage of the Indian Self–Determination Act, in which Congress directed the Secretary to enter into contracts with Indian tribes so they could manage the programs the Secretary administered for the benefit of Indians. Pub.L. No. 93–638, 88 Stat. 2203 (codified as amended at 25 U.S.C. §§ 450f–n, 42 U.S.C. § 2004b). Under the contract, the Tribe was to review lease proposals, prepare leases, and recommend approval or disapproval of leases to the Secretary. Additionally, the Tribe was responsible under the contract for the day-to-day administration and compliance review of the lease.

On September 16, 1979, the lessors appointed an agent, for undisclosed reasons, to represent them in the lease. The agent was assigned by the lessors to appoint an accountant to audit Pima's accounts, again for undisclosed reasons. No evidence exists that an audit was conducted at this time.

One year later, on January 2, 1980, a letter was written by Pima's legal counsel to the lessors in response to the lessors' concerns, dated November 26, 1979, about problems with the lease, including concerns regarding Pima's failure to submit certified financial statements of gross receipts, as required. The precise *nature* of the lessors' concerns, however, is not stated. In this letter, Pima promised "to comply with the reporting provisions of the lease by submitting 'certified' quarterly statements of gross receipts" for the calendar year 1980 and all subsequent years. (DX–9) (quotation marks as in the original). Later correspondence reveals that Pima failed to comply with this promise to supply the lessors with financial statements of receipts until April 10, 1987; and when submitted, even this statement was not certified as being prepared by a C.P.A. licensed in Arizona. From 1981–1986, much time and effort was spent by both parties in an attempt to re-negotiate the original lease and the terms for the renewal lease.

By late 1986, two letters from the lessors to the BIA reveal that the lessors were again troubled by the fact that they had not received any certified statements of receipts. In one letter, they requested the BIA to get these statements from Pima. In the other letter, the lessors stated their understanding that Pima was in breach of the lease because of the failure to submit certified statements of receipt and they expressed their desire to cancel the lease, which would enable them to enter into a new lease providing a higher return. Other evidence points to the fact that lessors were dissatisfied with the return provided by the Pima lease. They commissioned an agent in 1986 to perform a study of similarly-situated golf courses to determine the rate of return received by other clubs. This study confirmed the lessors' suspicions that Pima was earning considerably less than other golf courses in the Phoenix and Tucson areas.

In April of 1987, the Tribe finally received a certified statement of receipts from Pima, which it forwarded to the lessors. After examining the statements, the lessors were skeptical of the numbers reported and were troubled by the fact that the statements had not been prepared by an Arizona accountant, as required under the lease. Therefore, one month after receiving their first certified statement of receipts, the lessors authorized an accountant to do an independent audit of

Pima's books. This audit was completed on May 29, 1987, and it reported serious discrepancies in the manner Pima reported golf membership fees. According to the independent audit, Pima had been discounting its membership fees by 40%, reporting only 60% of membership fees. The lessors notified the Tribe and the BIA of their findings, sending them the audit. On the basis of the audit's findings, the lessors requested both the Tribe and the BIA to send Pima a "show cause for cancellation" letter, as required under federal regulations before cancellation of a lease upon a finding of lease violations. (DX–32 & 33). The BIA, in correspondence to the Tribe, acknowledged that there might be a problem with the lease and requested a report from the Tribe, as manager of the lease. Consequently, the Tribe arranged for its own audit, which confirmed the lessors' earlier findings that Pima had only included 60% of membership fees as gross receipts. With the Tribe's audit verifying lessors' allegations, the BIA sent a letter to Pima in December 1988 detailing its finding of the gross receipts deficiency, as well as other lease violations, and requesting Pima to show cause why the lease should not be cancelled. Mysteriously, the show cause letter was rescinded by the BIA, even though it felt that Pima's response to the letter was inadequate. The Tribe continued to investigate Pima for the next six months, resulting in numerous letters exchanged, meetings organized, questions asked and returned. Finally, in mid–1989, the Tribe threw up its hands and transferred the matter to the BIA.

When the BIA took over the investigation of Pima, it explored other issues besides the gross receipts deficiency, including the question of whether the leased premises were insured. From mid–1989 to early 1990, the BIA made three requests of Pima to provide evidence of insurance as required by the lease. In response to each of these three requests, Pima furnished evidence of insurance, either in the form of certificates of insurance or letters from the insurance companies confirming insurance. No further correspondence from the BIA on the issue of insurance appears on the record. As the investigation continued, the lessors grew increasingly frustrated by what they believed

was an inordinate delay by both the Tribe and the BIA to cancel the lease, which delay they thought was representative of the unsupportive handling of their lease since its inception. When the lease renewal date of June 30, 1989 passed, the BIA allowed Pima to carry on as a holdover tenant without deciding on Pima's request to renew the lease. Finally, on May 15, 1990, almost one year after the lease renewal date, the BIA concluded that Pima had been in default as of the renewal date and thus could not exercise its option to renew. Pima appealed the decision of the BIA not to renew the lease before the Interior Board of Indian Appeals. The Board affirmed the BIA, finding no error in its conclusion that Pima's reporting of only 60% of membership fees was a violation of the lease that justified the non-renewal of the lease.

The lessors filed the present suit in this court on February 7, 1991, under a claim of breach of fiduciary duty. They allege five counts of breach by the government as follows: (1) failure to require Pima to submit quarterly certified statements of gross receipts; (2) failure to determine whether gross receipts reported by Pima were accurate; (3) failure to require Pima to produce evidence of insurance and thus failing to discover that the leased premises were uninsured; (4) approval of the lease for a term of 25 years without considering the highest economic return to the lessors and failure to periodically adjust the rental provisions to take into account the changing economic value of the land; and (5) failure to promptly terminate the lease upon being informed of lease violations.

As a direct and proximate result of the government's alleged breach of fiduciary duties, the lessors contend that they have suffered damages in lost rents and profits under the lease, and loss of their ability to obtain the fair market value of the current, highest, and best use of the leased premises. In response, the government has moved to dismiss these claims on three grounds—(i) statute of limitations, (ii) failure to state a claim, and (iii) failure to join an indispensable party.

For the reasons given below, we hold that only lessors' last claim—the government's failure to promptly terminate the lease upon being informed of leasehold violations—survives the government's motions to dismiss premised on the statute of limitations and failure to state a claim. We also deny the government's motion to dismiss premised on the lessors' failure to join a necessary and indispensable party.

## DISCUSSION

### A. BACKGROUND

The lessors' complaint filed on February 7, 1991, avers five counts of breach of fiduciary duty by the government, as outlined above. On remand, the government filed a motion to dismiss the lessors' complaint. First, the government seeks to dismiss each count of the lessors' complaint on two grounds—(i) the statute of limitations and (ii) failure to state a claim. As the third ground for its motion to dismiss, the government challenges the lessors' complaint in its entirety for failing to join a necessary and indispensable party.

Because two of the grounds for dismissal bear on each count, we will discuss the statute of limitations and failure to state a claim grounds for the first count, before moving to the second count, and so on for all five counts. After we have finished our analysis of each count on the first two grounds for dismissal, we will lastly discuss the government's challenge to the entirety of the complaint on the ground that lessors have failed to join a necessary and indispensable party.

### B. STATUTE OF LIMITATIONS AND FAILURE TO STATE A CLAIM

1. *The Secretary's Failure to Require Quarterly Certified Statements of Gross Receipts*

(a) **Statute of Limitations—Count 1**

Lessors' first claim, or count, is that the government breached its fiduciary duty by failing to require Pima to submit quarterly certified statements of gross receipts. The government's first strategic move in this case seeks to dismiss the Indian lessors' claims of breach of fiduciary duty on the grounds of lack of subject matter jurisdiction pursuant to the Rules of the Court of Federal Claims (RCFC) 12(b)(1) because their claims violate the statute of limitations.

Such suits against the United States are, of course, subject to a six-year statute of limitations. 28 U.S.C. § 2501. The six-year time bar on actions against the United States is "a jurisdictional requirement attached by Congress as a condition on the government's waiver of sovereign immunity." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1576–77 (Fed.Cir. 1988). Because the statute of limitations affects this court's subject matter jurisdiction, rather than being an affirmative defense, the requirement is strictly construed and under no circumstances may it be waived by the court. *Laughlin v. United States,* 22 Cl.Ct. 85, 99 (1990), *aff'd,* 975 F.2d 869 (Fed.Cir. 1992); *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). If the motion to dismiss for lack of subject matter jurisdiction challenges the truth of the jurisdictional facts in the complaint, the court may look beyond the pleadings to consider all available evidence in order to determine jurisdiction. *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991). Similarly, if the court has doubts regarding jurisdiction, it may look at all the evidence presented to satisfy itself regarding the jurisdictional facts. *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461 (Fed.Cir.1998). In the instant case, the government has made an appropriate challenge to the lessors' allegations of jurisdictional facts in three of lessors' five claims. For these three claims, the government draws the court's attention to numerous exhibits, comprised primarily of correspondence from the files of the BIA and the Tribe. With respect to the underlying facts of the two remaining claims of the lessors, the government has simply denied the lessors' factual allegations. Accordingly, mindful of plaintiffs' burden to establish the jurisdiction of this court as well as our duty to ensure the existence of our jurisdiction, we will consider the evidence for each claim currently before the court in evaluating the government's motion to dismiss for lack of subject matter jurisdiction.

■ The present multiple-count complaint was filed in this court on February 7, 1991. Applying the six-year statute of limitations to the foregoing fact, lessors' claims will be time-barred to the extent they "first accrued" *prior* to February 7, 1985. To prove that their claim is not time-barred, the lessors must show that their claim first accrued within six years, or that their claim was either tolled because—(i) the government concealed facts so that lessors were unaware of their cause of action, or (ii) their injury was "inherently unknowable" at the time of accrual. *LaMear v. United States,* 9 Cl.Ct. 562, 569 (1986), *aff'd,* 809 F.2d 789 (Fed.Cir. 1986). As the lessors have not asserted, on this record, that the government concealed facts from them, we will confine our analysis to determining whether lessors' claims were tolled because they were "inherently unknowable." The first issue, therefore, is determining when each of the aforesaid claims accrued. We will next have to consider whether, if a claim is barred by the statute of limitations, circumstances justify the tolling of the statute on the basis that the injury to lessors was inherently unknowable. Finally, we will consider whether the continuing claim doctrine is applicable to bring later-arising claims within the limitations period. Before analyzing the facts of each count in detail, we will first discuss the legal standards we will use in determining whether a claim is time-barred.

■ The threshold analysis must test the rule that a claim first accrues when "all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland,* 855 F.2d at 1577. In the case at bar, lessors have asserted various breaches of fiduciary duty. For each breach of fiduciary duty, a claim accrues when there is a preexisting duty to act, and the beneficiary then "knew or should have known of the breach." *Jones v. United States,* 801 F.2d 1334, 1335 (Fed.Cir.1986).

Where we have determined that the statute of limitations has run (when six years has elapsed from the accrual date before the complaint is filed), the statute may nevertheless be tolled if the alleged injury was inher-

ently unknowable at the time of the accrual date of any claim. *Japanese War Notes Claimants Ass'n of Philippines v. United States,* 178 Ct.Cl. 630, 373 F.2d 356, 359 (Ct.Cl.), *cert. denied,* 389 U.S. 971, 88 S.Ct. 466, 19 L.Ed.2d 461 (1967). Explaining this doctrine, the Federal Circuit has held that the "'inherently unknowable' doctrine stands for no more than that the statute will not begin to run until [the plaintiff] learns or reasonably should have learned of his cause of action." *L.S.S. Leasing Corp. v. United States,* 695 F.2d 1359, 1366 (Fed.Cir.1982) (citing *Japanese War Notes,* 373 F.2d at 359). Generally, "[t]he test of whether a claim is inherently unknowable refers to the nature of the injury giving rise to the claim." *Lowe v. United States,* 20 Cl.Ct. 693, 695 (1990), *aff'd,* 925 F.2d 1479 (Fed.Cir.1991). Thus, our inquiry will focus on the *nature* of the breach of fiduciary duty to determine whether it was inherently unknowable. We need only consider, on this record, whether the statute of limitations was tolled with regard to those claims that we have already determined to be barred by the statute of limitations.

■ Finally, lessors, in their brief, have implied that the continuing claim doctrine applies to their claims, and the government has responded that the continuing claim doctrine is no longer recognized in this court, citing to *Hart v. United States,* 910 F.2d 815, 817 (Fed.Cir.1990), and *Sankey v. United States,* 22 Cl.Ct. 743, 746 (1991). Under this doctrine, an ongoing breach of a continuing duty creates "a series of individual actionable wrongs." *Mitchell v. United States,* 10 Cl. Ct. 787, 788 (1986). Thus, this doctrine seeks to save later arising claims even if the statute of limitations has lapsed with respect to the earlier events. *Id.* The rationale behind the foregoing is that the continuing claim doctrine preserves the six-year statute of limitations while preventing the defendant from acquiring a right to continue its wrongdoing. *Hopland,* 855 F.2d at 1581 (citing *Mitchell,* 10 Cl.Ct. at 788). In that connection, the Federal Circuit has recently, in 1998, discussed the continuing claim doctrine in terms that left no doubt as to its continuing viability. *Ariadne Financial Services v.*

*United States,* 133 F.3d 874, 879 (Fed.Cir. 1998). We find no reason, therefore, to assume that this doctrine, to the extent operative facts exist, is no longer recognized as binding precedent in this court. Thus, assuming that lessors have a cause of action against the government for the latter's alleged breach of fiduciary duty, all such claims, whether a single *or a continuing claim,* accruing prior to February 7, 1985, are barred by the six-year statute of limitations.

■ For the continuing claim doctrine to apply, therefore, the lessors' claims must be "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Estates–Fairfield Development Co. v. United States,* 127 F.3d 1449, 1456 (Fed.Cir.1997); *Ariadne,* 133 F.3d at 879. For instance, it is often applied in pay claims when claimants allege that the government has failed *periodically* to make proper payment; each periodic failure gives rise to a *new* and separate claim upon which suit can be brought. *Id.* The Federal Circuit in *Brown Park, supra,* relied in part on a Claims Court decision in which suit was brought by Indian allottees against the government for mismanagement of timber resources. *Mitchell,* 10 Cl.Ct. 787. As the first step in analyzing whether a continuing claim had been properly asserted, the Claims Court found that the government had a *continuing duty* to maintain the allottees' tracts of timberland in a state of productivity. *Id.* at 788. The alleged wrongs occurred *each day* the cutting of timber progressed, because the government failed in its continuing duty to regenerate the stand of trees. *Id.* Focusing on the *statute* defining the government's duty, the court held that the duty to replant was "an ever-present one, rather than one tied to a fixed point in time" and so "the non-performance of the duty is properly viewed as giving rise to a series of actionable breaches." *Id.* at 789. Thus, for this doctrine to be applicable, the claim must be

capable of being broken down into separate events. This circumstance will arise when the duty violated is of a continuing nature, such that a separate breach occurs at each natural interval in the Secretary's continuous duty.

We will now look at the lessors' first claim—the failure of the government to require Pima to submit quarterly certified statements of gross receipts—to apply the foregoing standards to the facts before us.

The lessors, in their brief, imply that they were unaware of the government's failure to require the submission of the quarterly statements of gross receipts until 1987, when the lessors' accountant revealed Pima's underreporting of gross receipts. In other words, it was not until their own 1987 audit revealed Pima's misreporting of gross receipts that the lessors contend they *should have* become aware of the government's "neglect in failing to monitor the lessee's receipts so as to have uncovered the misreporting." (Pl.'s Resp. Def.'s Mot. Dismiss (May 11, 1992) at 5). On the other hand, the government warmly contends that this claim accrued either in 1964 when the lease was approved, or in 1971 when the lessors sought information from the BIA regarding a bank's foreclosure on the current lessee, or at the latest in 1979 when the landowners authorized an audit of the lease. At any of these times, the government contends, the lessors actually knew of alleged "problem[s] with the lease," or, at the very minimum, should have known of such problems. (Def.'s Mot. Dismiss (June 20, 1991) at 10; see also Def.'s Reply Pl.'s Resp. Def.'s Mot. Dismiss (June 8, 1992) at 2–4). We find, on this record, that this claim accrued in 1964, or, at the latest, in 1979.

First, we note that the lease required the lessee to submit certified statements of gross receipts *both to the lessor and to the Secretary.*[2] Lessors state that the first statement of gross receipts they received was in 1987. Assuming that this assertion is true, two

---

2. Paragraph 14(d)(5) of the lease provides:

At the time each payment of percentage rental is due the lessee shall submit to the lessor and to the Secretary, a certified statement of the "gross receipts from business conducted on the leased premises," during the three months of the accounting year for which said payment is due, prepared by a certified public accountant, licensed in the State of Arizona, in conformity with standard accounting procedures.

questions must be answered to determine when this claim accrued—(i) Should the Indian lessors have known after signing the lease that they were entitled to receive the quarterly statements of receipts? and (ii) Should they have realized that the failure to receive the statements each quarter indicated that the government was breaching its alleged duty to require the submission of the certified statements? In this regard, lessors contend that their personal situations, *i.e.*, their limited education and limited experience, render them lacking in the level of sophistication required to discover financial fraud. Indeed, from an examination of affidavits submitted by lessors, it is apparent that many of the present lessors were not the signatories to the lease but inherited their allotment from relatives. It is quite probable that, were it not for the peculiarities of the federal law governing control of Indian land, many of the present lessors would not be a party to a sophisticated commercial lease such as the present one. Because this court is mindful of and sympathetic to the history of the American Indian, we will examine this contention in some depth, consistent with the well-known standards pronounced by the U.S. Supreme Court, *infra.*

■ The general rule of contract law is that, in the absence of fraud, misrepresentation, or deceit, one who executes a contract cannot avoid it on the grounds that he did not read it or was ignorant of its terms. 2 Williston on Contracts § 6:43 (4th ed.1991). On this record, we must decide whether the special status of Indians warrants a departure from the general rule. On the one hand, a line of cases adopts a *liberal reading* of statutes relating to Indians. For example, courts have developed canons of construction that read treaties and other federal acts as protecting Indian rights and *interpret them in a manner favorable to Indians.* This liberal reading stems from the United States' trust obligations to American Indians. *Felix S. Cohen's Handbook of Federal Indian Law* Ch. 3 § C2b(2) (1982). Thus, treaties are liberally construed to favor Indians and ambiguous expressions are resolved in their favor. *McClanahan v. State Tax Comm'n of Arizona,* 411 U.S. 164, 174, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Choctaw Nation of Indi-*

ans v. United States, 318 U.S. 423, 431–32, 63 S.Ct. 672, 87 L.Ed. 877 (1943). The liberal interpretation of treaties has, by practice, been *extended to statutes, agreements, and executive orders. Cohen, supra.* Against this background, we might be encouraged to be more indulgent toward the lessors' argument that they lacked the sophistication to detect fraud in the lease. Nonetheless, we are compelled by contrary case law, discussed below, to dismiss lessors' plea of ignorance.

■ Substantial precedent holds that Indians are *not* granted special consideration on the basis of ignorance of the accrual of claims under the statute of limitations. Our predecessor court has held that "the statute of limitations applies to Indians the same as to anyone else," *Fort Mojave Tribe v. United States,* 210 Ct.Cl. 727, 728 (1976), and, moreover, the statute of limitations is not tolled by the Indians' ignorance of their legal rights, *Menominee Tribe of Indians v. United States,* 726 F.2d 718, 721 (Fed.Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984). Thus, the rule of "liberal construction" of treaties *should be* confined only to the context of treaties. *Capoeman v. United States,* 194 Ct.Cl. 664, 440 F.2d 1002, 1008 (1971). Finally, the Supreme Court has stated that, "it is now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." *Fed. Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 80 S.Ct. 543, 4 L.Ed.2d 584 (1960). From the cases cited above, we are constrained to hold that the lessors' status as Indians, uneducated and inexperienced in business affairs, does not, *ipso facto,* excuse them from the ordinary application of the statute of limitations.

■ We now return to the question of when the lessors *should* have known that the government was failing to require the submission of certified statements of gross receipts by Pima. In the case at bar, the lessors' signatures appear on the lease. Under general contract law discussed earlier, they are, of course, deemed by virtue of their signatures to have knowledge of the contents

of the lease. This knowledge includes the requirement that the lessee was contractually obligated to submit certified financial statements of gross receipts to the lessors every quarter. When the lessors failed to receive the certified statements of gross receipts after the first quarter and each quarter thereafter, they should then have been aware, first, that Pima was not sending the statements as required—thus violating the lease—and, second, that the government was also not enforcing this lease requirement. Because the lessors should have known sometime shortly after the *first quarter of the lease in 1964* that the government was not enforcing this lease provision, their claim as to the first count accrued in 1964, or shortly thereafter. This claim was not filed within six years of its accrual—it was filed in 1991—so it is barred by the statute of limitations.

■ The statute of limitations may nevertheless be tolled if a claim is inherently unknowable. We do not find that this injury was, by its nature, inherently unknowable. For instance, a letter dated in 1980 and written by Pima's attorney in response to a letter from the lessors makes clear that lessors knew or should have known that Pima was not providing certified statements in accordance with the provisions of the lease. The letter refers to the lessors' 1979 "request for certified financial statements." This request is circumstantial evidence that, as of 1979, the lessors were aware both that certified financial statements of gross receipts were required under the lease and that Pima was not complying with the lease's provision requiring their submission. If lessors had actual knowledge that certified statements were not being provided, it cannot be an "inherently unknowable" fact.

Moreover, lessors may reasonably be charged with the knowledge of the contents of the lease to which they were parties, which was signed by them or their predecessors in interest. Thus, the Indian lessors knew or should have known at the execution of the lease that Pima was required to provide quarterly, certified financial statements under the lease. They also knew or should have known in late 1964 that Pima was not

complying with this requirement based on the fact that they themselves had never received any certified financial statements from Pima, as required by the lease. As the recipients of the quarterly statements, the lessors were in a position to know if certified statements were not being submitted. Thus, we hold that the government's alleged breach of a duty to ensure such statements were submitted was not "inherently unknowable" so as to permit the tolling of 28 U.S.C. § 2501.

Lessors have also averred, in their complaint, that the government's duty, *i.e.*, to ensure that certified financial statements of gross receipts were submitted, was a "continuing duty," conjuring up the continuing claims doctrine. This doctrine, as defined by the Federal Circuit, has been held applicable where plaintiffs have *pled* a series of distinct and separate events as one continuing event. *Ariadne*, 133 F.3d at 879. In the present claim against the government, lessors have alleged that the government failed to require Pima to submit the certified statements pursuant to the government's alleged duty under the Long–Term Leasing Act, 25 U.S.C. § 415, and its related regulations, 25 C.F.R. §§ 162.5(a), 162.5(b), and 162.8. Under the Federal Circuit's definition, lessors have pled a continuing claim because this single claim is composed of a series of separate and distinct events occurring each quarter, *i.e.*, the failure each quarter to ensure that certified statements were submitted. Thus, this claim is subject to the continuing claims analysis, provided, of course, there exists a pre-existing statutory or regulatory duty.

■ Under the continuing claims analysis, a court looks to see whether the government owes a continuing and ever-present duty to the plaintiffs. *Mitchell*, 10 Cl.Ct. at 788. The analysis, therefore, requires that we address at this juncture whether a continuing duty exists towards the lessors under the applicable statute and regulations, necessitating that we jump forward prematurely to our conclusion regarding whether a legally sufficient claim has been stated by the lessors. For the limited purpose of determining whether lessors' claim is saved by the continuing claims doctrine, we must, of

course, first determine whether the government is under a *continuing* duty to ensure lease compliance. As we shall discuss in more detail below when we examine the legal sufficiency of lessors' claims, *infra* at 551, we find that the cited statutes and regulations *do not* place a *duty* on the Secretary of the Interior to monitor or ensure compliance with the lease during the life of the lease. Because the Secretary was not under an ever-present and perpetual statutory duty to monitor and enforce compliance with the lease, separate breaches could not have occurred throughout the life of the lease. Therefore, the *continuing claims* doctrine does not save this claim. At this juncture, however, we have only determined that the government does not owe lessors a continuing duty; we still assume, solely for the limited purposes of determining whether to dismiss this claim on the basis of the statute of limitations, that the government owes *some* duty to the lessors. Lessors' claim, if any, that the government failed in its duty to require submission of the certified statements of gross receipts accrued only *after* the passing of the lease's first quarter in 1964, when lessors did not receive the certified statements and when lessors thus knew or should have known that the government was not enforcing the lease. Since 1964 is not within six years of the filing of this claim, the lessors' first claim is completely time-barred.

#### (b) Failure to State a Claim—Count 1

The government's second ground in its motion to dismiss count 1 is for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4). This court will grant a motion to dismiss for failure to state a claim only if the lessors "can prove no set of facts in support of [their] claim which would entitle [them] to relief." *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Consequently, we must presume the facts alleged in the complaint to be true and correct, and the facts alleged will be construed in the light most favorable to the lessors. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). Unlike in a motion challenging our subject matter jurisdiction, we will limit our review strictly to the factual allegations in the complaint to determine whether any set of facts contained therein would, if proved, entitle the lessors to relief. If so, we will deny the government's motion.

In its motion to dismiss, the government contends that the lessors have *failed to allege* any breach of fiduciary duty which the statutes or regulations place upon the government. Our analysis of the government's motion is guided by the Federal Circuit's opinion in this case on a prior appeal. First, the Federal Circuit conclusively established that a general fiduciary relationship exists between the government and the lessors when it stated that "section 415(a) [the Indian Long–Term Leasing Act] and the implementing regulations of part 162 impose upon the government a fiduciary duty in the commercial leasing context." *Brown v. United States*, 86 F.3d 1554, 1563 (Fed.Cir.1996). The court, however, did not confine itself to determining the mere existence of this fiduciary relationship. It concluded its opinion by defining the scope of the government's duty to the lessors, stating that the scope of such fiduciary relationship "is established by the regulation[s] that control this type of leasing," and that the "statutes and regulations ... 'establish a fiduciary relationship and *define the contours of the United States' fiduciary responsibilities.*'" *Id.* (emphasis in original) (quoting *United States v. Mitchell*, 463 U.S. 206, 224, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)). If no regulation places a duty squarely on the Secretary to perform an act, the government cannot be liable for breach of trust in its performance or nonperformance of that act. *Brown*, 86 F.3d at 1563. Under similar reasoning, the government is *not required* to go beyond that which is compelled by the regulations. *Pawnee v. United States*, 830 F.2d 187, 192 (Fed.Cir. 1987). Therefore, in order to state a proper legal basis for recovery arising out of an alleged breach of trust, the lessors *must point to a statute or regulation* that imposes a clear duty on the Secretary, and they also must demonstrate that the facts, as alleged in their complaint, show a likely breach of

that duty. In this context, we analyze lessors' first claim.

As to the first count, the government's failure to compel submission of regular certified statements of gross receipts, lessors argue that the duty to ensure compliance with lease provisions is rooted in the statute, 25 U.S.C. § 415, and three regulations, 25 C.F.R. §§ 162.5(a), 162.5(b), and 162.8. We find, after a careful examination of these provisions, no duty therein was placed on the government to monitor lease compliance.

■ For the purposes of this motion, we assume the truth of the allegations in the lessors' complaint. Thus we assume both that Pima failed to submit the required statements under the lease and that the government did not enforce compliance with this lease provision. We next look at the governing statute and regulations to see whether, if lessor's allegations are true, they have stated a cognizable claim.

The governing statute, 25 U.S.C. § 415, provides that restricted Indian land may be leased "with the approval of the Secretary of the Interior," and it further states the factors for the Secretary's consideration before approval of the lease. 25 U.S.C. § 415(a). The Secretary must be satisfied that:

> . . . adequate consideration has been given to the relationship between the use of the leased lands and the use of neighboring lands; the height, quality, and safety of any structures or other facilities to be constructed on such lands; the availability of police and fire protection and other services; the availability of judicial forums for all criminal and civil causes arising on the leased lands; and the effect on the environment of the uses to which the leased lands will be subject.

25 U.S.C. § 415(a). This statute places a duty on the Secretary to "adequate[ly] consider[ ]" the enumerated factors *before approving* a long-term lease, but it says absolutely nothing about the Secretary's duties *during* the course of the lease with specific reference to ensuring ongoing or perpetual compliance with the lease in operation.

Cited next is 25 C.F.R. § 162.5(a), which states: "All leases made pursuant to the regulations in this part shall be in the form approved by the Secretary and subject to his written approval." This regulation makes it a requirement that all leases be in a format approved by the Secretary and that the lease be approved by the Secretary. No language in this regulation places a duty on the Secretary to monitor compliance, to any extent, with an existing lease.

A similar problem arises with 25 C.F.R. § 162.5(b), which states: "Except as otherwise provided in this part, no lease shall be *approved or granted* at less than the present fair annual return." (emphasis added). This regulation places a duty on the Secretary to ensure, *prior to approving* or granting a lease, that the lease fairly compensates Indian-lessors to the extent of the "present fair annual value." It gives no direction at all requiring the Secretary to monitor compliance with an existing lease.

The final regulation cited, 25 C.F.R. § 162.8, concerns the duration of the lease. It provides that:

> Leases granted or approved under this part shall be limited to the minimum duration, commensurate with the purpose of the lease, that will allow the highest economic return to the owner consistent with prudent management and conservation practices. . . . [U]nless the consideration for the lease is based primarily on percentages of income produced by the land, the lease shall provide for periodic review, at not less than five-year intervals, of the equities involved. . . . Any adjustments of rental resulting from such review may be made by the Secretary where he has the authority to grant leases, otherwise the adjustment must be made with the written concurrence of the owners and the approval of the Secretary.

This regulation details another factor for the Secretary's consideration when *approving* the lease. It also requires that all leases, except those based on percentage rentals, shall provide for a periodic review of the economic return provided by the lease. The regulation, as written, does not require the Secretary to perform such review, only that he approve rental adjustments made pursuant to the review. Nothing in this regulation

places a firm duty on the Secretary to monitor compliance with lease terms.

We also note that the long-standing objective spurring passage of the Long–Term Leasing Act was to encourage and enable Indian landowners to handle their own affairs without assistance from the federal government. H.R. Rep. 84–1093 (1955). It is consistent with this basic objective that the duties of the government be interpreted minimally, ensuring that Indians receive the full responsibility of managing their own affairs. In light of these ends, it is fitting that Congress limited the caretaker role of the government to mere approval of a lease to ensure that the lease, being of long duration, is not harmful to the Indian allottees' long-term interests. The fact that the government is not a trustee for the day-to-day management of these leases indicates the increased responsibilities passed on to Indians for the direction of their own affairs.

Because none of the cited regulations place a duty on the Secretary to ensure compliance with the terms of an existing lease, we hold that the lessors' allegation that the Secretary failed to enforce the lease provision requiring quarterly certified statements of gross receipts does not state a claim upon which relief can be granted.

2. *The Failure to Determine Whether Gross Receipts Reported Were Accurate*

(a) **Statute of Limitations—Count 2**

Lessors' second claim is that the government failed to determine whether the gross receipts *reported* by Pima were inaccurate. The accuracy of the reported gross receipts is singularly important to lessors because it affects and determines the basis for calculating the percentage rental payment to which plaintiffs are entitled. Lessors state that they did not know nor should they have known of the alleged inaccuracy of the gross receipts until they received the results of their own independent audit in 1987, which was well within the six-year statute of limitations running from the filing of the complaint on February 7, 1991. The government argues that this claim first accrued after the initial payments were made in 1964, or in 1971 when the lessors sought information from the BIA regarding a bank's foreclosure on the current lessee, or, at the latest, in 1979 when the landowners authorized an audit of Pima. At any of these times, the government contends, the lessors actually knew or should have known of problems with the lease and also then knew of the government's failure to perform its alleged duties under the lease. We find that this claim, assuming its viability, also accrued in 1964, shortly after the elapse of the first quarter of the lease and sometime prior to the end of 1979.

We begin our analysis by observing that nowhere do we see evidence, prior to the audit of May 29, 1987, that the lessors actually *knew* that the gross receipts were inaccurate as reported. The government points us to letters indicating that the lessors had knowledge of lease violations. After a careful examination of the letters, we find that none of such letters indicates that lessors *knew* that Pima was underreporting its gross receipts. One letter from lessors merely expresses regret about a bank's foreclosure on the lessee; another states no view whatsoever on the current lease but is rather a request to the Tribe to approve lease modifications. In another cited letter, the lessors authorize an agent to represent them in the lease and to appoint an accountant; however, we cannot infer from the foregoing that the lessors *knew* Pima was underreporting its gross receipts. Yet another letter talks about "upgrading" the lease after the current lease expires. This letter also does not reveal lessors' knowledge as to the accuracy of Pima's reported receipts.

Two letters are vaguely probative. The first is a letter from Pima's legal counsel referring back to a letter from the lessors sent a couple months earlier in 1979. According to Pima, the lessors' letter informed Pima of a lease violation and requested certified financial statements from Pima. This correspondence does not reveal the nature of the purported lease violation. Putting the letter in the context of other correspondence, the suspected violation could just as well have been an earlier assignment of the lease, an issue that was contested between

the parties at this time and later. Thus, we find that this letter is inconclusive as to lessors' knowledge that gross receipts were inaccurate. The second mildly probative letter is from the lessors to the BIA and refers to the fact that the required certified statements of gross receipts have not been received by the lessors. Despite lessors' admission that they have not received the required statements, this knowledge does not, *ipso facto*, translate to knowledge that Pima was in fact *underreporting* its gross receipts. Thus, we are not convinced to a reasonable certainty from the letters cited by the government that the lessors' dissatisfaction with the lease or knowledge of lease violations stems from knowledge or suspicion that Pima was *underreporting* gross receipts. Therefore, we hold that it was not until the May 1987 audit report of Pima by the lessors' auditors that lessors actually *knew* of Pima's underreporting of gross receipts.

■ The next question, of course, is when, notwithstanding the foregoing, the lessors *should* have known that Pima was underreporting its gross receipts. We note that case law clearly lays a duty to investigate under certain circumstances upon potential plaintiffs. For example, "an individual is expected to act with reasonable diligence in the protection of his interests." *Mitchell,* 10 Cl.Ct. at 67. And, "the Indian beneficiary of a trust, no less than any other, is charged with notice [*i.e.,* knowledge] of whatever facts an inquiry appropriate to the circumstances would have uncovered." *Id.* at 68. Thus, as the Federal Circuit has stated, in order for the statute of limitations to commence running, it is generally "sufficient that [plaintiffs] were on notice to inquire that they had a potential claim." *Hohri v. United States,* 847 F.2d 779, 783 (Fed.Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 307, 102 L.Ed.2d 326 (1988). Moreover, "[w]hatever is notice enough to excite attention and put the party on his guard and call for inquiry, is [also] notice of everything to which such inquiry might have led." *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 141, 25 L.Ed. 807 (1879), *quoted in Mitchell,* 10 Cl.Ct. at 67–68. Distilling the above case law to its

essence, we hold that potential plaintiffs, such as those here at bar, are deemed to "know" those facts that would have been revealed to them in an investigation conducted by a person whose suspicions have been reasonably aroused.

■ On the facts presented at bar by the parties, lessors should have, on this record, become suspicious shortly after the passing of the first quarter of the lease when they failed to receive the required certified statement of gross receipts from Pima. The very purpose of the certified statements was to verify the accuracy of the gross receipts reported by Pima and to ensure that the percentage rental payments were accurate. Based on this justifiable suspicion, lessors were or should have been on notice to investigate their potential claim for damages at that time. Lessors hospitably argue that the *government* should have been able to discover Pima's fraud and to prevent the damage to the lessors if the government had forced Pima to comply with the certified statement requirement. Using the lessors' reasoning, it follows that had the lessors themselves investigated when a reasonable person's suspicions would have then been aroused, *i.e.,* at Pima's failure to submit to them the required verification of gross receipts, the *lessors* would have then found that gross receipts were reported inaccurately. The fact that the lessors failed to actually discover that they had suffered damages as a result of the government's alleged misfeasance, as trustee, until 1987 will not delay the commencement of the six-year limitations period, because lessors had a duty to investigate from the time they knew or should have known of the breach. Since they should have known of the breach when they knew the certified statements of gross receipts were not being submitted by Pima, we hold that the claim accrued in 1964 or shortly thereafter. Inasmuch as 1964 is not within six years of the filing of this claim on February 7, 1991, we hold that the claim is time-barred by the statute of limitations.

■ Tolling of the statute of limitations may be appropriate for this claim because we have previously determined that the claim is

time-barred. The lessors contend that, because of their limited education and business experience, they would have been unable to conduct an audit or to decipher complex financial statements and, thus, could not have learned of the underreporting of gross receipts by Pima. As a result, they claim that they had no way of knowing of the alleged breach or of their cause of action. The Federal Circuit has held that "the running of the statute of limitations will not be tolled when the Indians were capable enough to seek advice, launch an inquiry, and discover through their agents the facts underlying their current claim." *Menominee Tribe of Indians,* 726 F.2d at 721. The fact that the lessors were themselves incapable of performing an audit or scrutinizing financial reports is of no consequence. From the totality of the evidence submitted, it is clear that lessors were capable of making pointed and focused inquiries, such as writing letters to government officials, requesting financial statements from Pima, and hiring a lawyer and an accountant. For example, in 1979, the lessors hired a business agent and authorized him to appoint an accountant to perform an audit. No audit was ever commissioned, however, until 1987, after the lessors allege they received their first certified statement. These circumstances, nonetheless, reveal that the Indian lessors were then capable of starting an inquiry by seeking advice from agents.

Thus, the operative factual inquiry is, in 1979 or prior thereto, "whether the plaintiff[s] ... had sufficient *opportunity* to discover the facts." *Cherokee Nation of Oklahoma v. United States,* 26 Cl.Ct. 798, 802 (1992) (emphasis added). While it appears from the record that no certified statements were provided by Pima before 1987, lessors were nevertheless aware (or should have been aware) that the lease required Pima to submit such statements to them. Furthermore, they were aware (or should have been aware) that the government was not ensuring compliance with that lease provision. From the date in 1964 when Pima first failed to comply with the lease's certified statement provision, until February 7, 1985, lessors *could* have hired an agent to investigate the true state of Pima's gross receipts. Also, the lease, which they signed, included a requirement that Pima open its books to inspection by accounting agents of the lessors. Thus, the lessors also had the opportunity to discover Pima's misreporting. Had they taken advantage of this opportunity, the lessors, through their lawyers or accountants, could have discovered the underreporting of gross receipts earlier than they did. Because the facts upon which the lessors could have discovered that Pima was underreporting its gross receipts was known to lessors, *i.e.,* the failure of their filing the periodic quarterly financial statements, and they had the opportunity to discover the underreporting, their claim was not "inherently unknowable." We, therefore, hold that the statute of limitations on this claim is not tolled.

As with the first claim in count 1, we are satisfied that this claim, *i.e.,* count 2, is also subject to the continuing claim analysis because the claim, alleging failure to determine whether gross receipts reported by Pima were accurate, is linked with the alleged failure to require the filing of the multiple quarterly certified statements of gross receipts. For each quarter that the government allegedly failed to require the submission of certified statements, the government consequently allegedly failed to determine whether the gross receipts reported by Pima were accurate. To be applicable, however, the continuing claim doctrine, as discussed earlier, requires the finding of a *continuing duty* on the part of the Secretary. For reasons we will discuss below, *infra* at 555–556, we find that there is no specific continuing fiduciary duty placed on the Secretary to ensure that rental payments are adequate. Thus, the lessors' second claim, if any, that the government failed in its duty to ensure that gross receipts reported were accurate, which accrued after the lease's first quarter in 1964 elapsed, is barred by the statute of limitations.

**(b) Failure to State a Claim—Count 2**

The lessors argue that when the government failed to discover that Pima was underreporting its gross receipts, it violated its statutory duty under 25 C.F.R. § 162.8,

*supra.* As discussed above, this regulation bears only on the Secretary's duty *when approving a lease.* It imposes no duty on the Secretary to ensure that lessees pay the proper rental payment throughout the lease. Although the regulation also requires leases to provide for a periodic review of rental amounts, the language of the regulation only contemplates a review of the rental payments in the context of *current* economic conditions. A review of whether past rental payments were *fairly* reported is clearly outside the scope of this regulation. Moreover, the regulation fails to place any duty on the Secretary to perform the periodic review; it merely requires his approval should an adjustment in the rental payment be made. Thus, even assuming that Pima did, in fact, underreport its gross receipts and paid the lessors less than they were due under the lease, the Secretary had no duty under this regulation to ensure that Pima accurately reported its gross receipts upon which its percentage rental payments were based. Lessors have, therefore, failed to state a claim upon which relief can be granted.

### 3. The Failure to Require Proof of Insurance and to Discover that the Leased Premises Were Uninsured

#### (a) Statute of Limitations—Count 3

█ The lessors' third claim is that the government failed to require Pima to produce evidence of insurance and thus failed to discover that the leased premises were uninsured. We are without the benefit of lessors' allegation as to when this part of their claim arguably accrued. Additionally, the government has simply denied the lessors' factual allegations and has failed to counter lessors' allegations with specific evidence challenging this court's jurisdiction over this claim. Because in this court it is settled law that the statute of limitations is a jurisdictional issue, "the party who seeks the exercise of jurisdiction in his favor ... must allege in his pleading the facts essential to show jurisdiction." *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Hopland,* 855 F.2d at 1576–77. Thus, one seeking to invoke the jurisdiction of this court bears the threshold burden of pleading the essential facts to show that the claim is timely filed. The U.S. Supreme Court has defined the burden of proof required of a plaintiff seeking a court's jurisdiction in these terms:

> The prerequisites to the exercise of jurisdiction are specifically defined and the plain import of the statute is that the [trial court] is vested with authority to inquire at any time whether these conditions have been met.... In the nature of things, the authorized inquiry is primarily directed to the one who claims that the power of the court should be exerted in his behalf. As he is seeking relief subject to this supervision, it follows that he must carry throughout the litigation the burden of showing that he is properly in court. The authority which the statute vests in the court to enforce the limitations of its jurisdiction precludes the idea that jurisdiction may be maintained by mere averment or that the party asserting jurisdiction may be relieved of his burden by any formal procedure. If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof. And where they are not so challenged the court may still insist that the jurisdictional facts be established or the case be dismissed, and for that purpose the court may demand that the party alleging jurisdiction justify his allegations by a preponderance of evidence.

*McNutt,* 298 U.S. at 189, 56 S.Ct. 780. Following the emphatic direction established by the Supreme Court, this court will determine whether the lessors have asserted probative facts sufficient to establish, by a preponderance of the evidence, that their claim accrued within six years of the filing date of this case.

Here, lessors have not cited in their briefs or pleadings any factual events or exhibits establishing the accrual date of this claim, as required. Consequently, we find that they have totally failed to meet their burden in that they have failed to produce one scintilla of probative evidence supportive of subject matter jurisdiction. Thus, because lessors have failed to "support [jurisdictional facts] by competent proof" we are constrained to hold that the lessors have failed to establish

this court's jurisdiction over this claim, and the claim must be dismissed. *See McNutt,* 298 U.S. at 189, 56 S.Ct. 780.

■ Notwithstanding the foregoing, it is nonetheless the duty of every federal court to determine for itself the jurisdiction of claims before it. *RHI Holdings,* 142 F.3d at 1461. Subject matter jurisdiction of this claim is dependent on it being timely filed. Because the lessors' claim is that the government failed to require Pima to produce evidence of insurance and thus failed to discover that the leased premises were uninsured, we must examine the documents submitted by both parties in search of an indication as to when the premises were uninsured by Pima. The government's alleged failure to discover the lack of insurance will, of course, have occurred at that time or thereafter.

■ In searching through all the documentary evidence submitted by the parties, we find several documents that are relevant to this inquiry. These documents reveal that in 1989 and 1990, Pima provided evidence of insurance in response to requests by the BIA in 1989 for proof of insurance. From these documents, we can also conclude that the premises were *insured* from October 15, 1979, through March 1, 1990. Additional documents reveal that the lessee prior to Pima had also insured the premises from 1974 to 1977. No other evidence exists on this record indicating that the premises were *uninsured* at any time. From the foregoing, we cannot determine that the government failed to require proof of insurance or that Pima at any time failed to insure the leased premises. Essentially, the lessors have failed to present facts from which we can determine the reasonable date of *accrual* for this claim. Without an accrual date for a claim, we cannot determine whether a claim is timely filed. Therefore, we cannot confirm this court's jurisdiction.

We do not consider whether the statute of limitations was tolled with respect to this claim because the issue here is not whether plaintiffs did not or could not have known of the accrual, but there is simply a total failure by the plaintiffs to carry their primary burden of proof. Furthermore, the continuing claim doctrine is inapplicable to this claim

because, to the best knowledge and information of this court, the claim has simply not accrued. Because plaintiffs bear the burden of showing that they are properly in court, and because lessors have failed to meet this burden of showing that the complaint was timely filed within six years of the accrual date, we hold that this court is without jurisdiction to entertain their claim that the government breached its fiduciary duty to them by failing to discover that the premises were uninsured by Pima.

### (b) Failure to State a Claim—Count 3

■ The government also argues in its motion to dismiss that lessors' claim, for the government's failure to require proof of insurance, fails to state a claim upon which relief can be granted. Lessors in this claim allege that the Secretary's duty to require Pima to produce proof of insurance derives from 25 C.F.R. § 162.5(d). This section states that:

> The lessee *may* be required to provide insurance in an amount adequate to protect any improvements on the leased premises; the lessee *may* also be required to furnish appropriate liability insurance, and such other insurance as may be necessary to protect the lessor's interest.

(emphasis added). This section is a permissive provision, simply allowing leases to require the placement of insurance on the premises, for liability, and for other necessary purposes. Clearly, it fails to place any duty on the Secretary regarding the placement of insurance. Since the Secretary is not commanded by operative words of the statute to verify insurance, this claim fails to state a cognizable claim.

*4. The Inappropriate Approval of the Lease for a Term of 25 Years Without Consideration of the Highest Economic Return and Failure to Adjust the Rental Provisions*

### (a) Statute of Limitations—Count 4

Fourth, the lessors contend that the government, through the Secretary, inappropriately approved the lease for a term of 25 years despite the fact that the lease was for "valuable, commercially developable lands in

an area that was developing rapidly"; and the lessors further allege that the Secretary failed to adjust the rental provisions to take into account the changing economic value of the land. This count is essentially two claims packaged as one.

■ The first half of this compound claim relates to the exercise of discretion by the government, *i.e.*, the approval of a 25–year lease with an option to renew. Any breach that occurred in its duty, if any, to consider the impact of the duration of the lease prior to approval, occurred at the latest when the lease was signed by the Secretary, signalling his approval of the lease. This lease was signed by an authorized agent of the Secretary on June 1, 1964, effective as of July 1, 1964. A breach in the Secretary's alleged duty to consider the long-term economic return to lessors in approving a lease of 25–year duration, such as here, would have totally accrued on that date. Thus, this part of the claim is time-barred because it was not filed within six years following the accrual date.

■ The second half of this claim avers a failure by defendant to adjust the rental payment amounts on a periodic basis. The lease at bar contains a standard clause requiring rental adjustments on those long-term leases "which are not based primarily on percentages of income produced by the land...." (Lease ¶ 7 (emphasis added)).[3] Unfortunately, we are again without the benefit of lessors' allegations as to *when* this claim first accrued, and the government has simply denied lessors' allegations. This court must, therefore, determine to its own satisfaction whether jurisdiction exists over this claim, notwithstanding the foregoing, by independently examining the meager evidence before it.

Although much of the evidence submitted by the parties consists of correspondence between Pima, the Tribe, and the lessors regarding Pima's revenues, one document is useful in helping us infer whether the rental payments sent to the lessors were adjusted. The document reveals that for the quarter April 1, 1989, through June 30, 1989, the rate used to compute the percentage rental payment remained 4%, and the ground rental payment remained $3,500. These rental amounts are the same amounts as originally required in the lease. We can thus infer from this document that rental amounts were not adjusted as of 1989. Because, for the purposes of this motion, we must assume that plaintiffs' claim is true, we must assume that the Secretary had a duty to adjust rentals. From the above document, we find that rentals were not adjusted as of 1989, meaning they had probably never been adjusted since 1964 at the required five-year intervals. Thus, lessors' claim for failure to adjust rentals *first* accrued in 1969, five years after the start of the lease when a rental review and adjustment should have been made. Since 1969 is not within six years of the filing of this claim on February 7, 1991, the claim is time-barred by the statute of limitations.

■ Because this claim is barred by the statute of limitations, we must determine whether it is inherently unknowable, justifying the tolling of the statute of limitations. This claim is not, by its nature, "inherently unknowable." As to the first half of this claim, whether a business decision, such as one electing a 25–year lease rather than a shorter-duration lease, offers the highest economic return is a matter of judgment exercised upon publicly-available facts. These facts include the returns garnered by similar sized lots, in a similar area, with similar amenities. From the evidence submitted, we find that such information regarding local golf courses was gathered by an agent hired by lessors in 1986 when they were attempting to re-negotiate the lease to increase their return. This fact is evidence that the lessors were capable of informing themselves on the

---

3. Paragraph 7 of the lease states in full as follows:

> The rental provisions in all leases which are granted for a term of more than five years and which are not based primarily on percentages of income produced by the land shall be subject to review and adjustment by the Secretary at not less than five-year intervals in accordance with the regulations in 25 C.F.R. 131. Such review shall give consideration to the economic conditions at the time, exclusive of improvement or development required by this contract or the contribution value of such improvements.

relative merits of their lease versus other possibilities. Thus, at the time the lease was signed, they could have performed their own evaluation of the economic return offered by the lease. Because the information to make such evaluation was public knowledge, and the lessors have shown that they are capable of informing themselves regarding the expected return on their lease, the injury is not inherently unknowable. The statute of limitations on this part of the claim is, therefore, not tolled.

 Regarding the latter part of the claim in count 4, *i.e.*, the failure by the Secretary to periodically review and adjust the rental amounts, this claim is also not "inherently unknowable" because the lessors are the parties most affected by the government's failure. The lessors signed the lease and are deemed to have knowledge of its contents, including the provision requiring periodic review and adjustment of rentals by the Secretary. Lessors also state in affidavits that they received for every quarter one check that remained the same amount and one check that varied in amount. Additional evidence shows that the ground rental remained $3,500 per quarter for the life of the lease. From these facts, we can infer that ground rental payments remained constant throughout the lease, and lessors were aware that one check from Pima remained constant throughout the lease. The recipient of a check is generally the first person to be aware whether scheduled increases have been forthcoming. When the ground rental payments remained constant after the first five-year review period elapsed, lessors would have actually known whether their rental payments were adjusted. If the payments were not adjusted, they could have inquired whether a review had in fact been performed. Because a rental review and adjustment would affect the rental checks lessors received each quarter and because lessors knew of the rental amounts they were receiving each quarter, the facts underlying this claim is not inherently unknowable to the lessors. Therefore, these facts were not "inherently unknowable," and the statute of limitations for the latter part of this claim is not tolled.

 The claim may still survive, however, if it is a continuing claim, in which later arising claims may not be barred if they fall within the limitations period. As stated earlier, a continuing claim alleges an ongoing breach of a continuing duty, creating "a series of individual actionable wrongs." *Mitchell*, 10 Cl.Ct. at 788. For this doctrine to apply, the lessors' claim must be "susceptible to being broken down into a series of independent and distinct events or wrongs." *Brown Park*, 127 F.3d at 1456. The first half of the present claim, however, is not susceptible to being broken down into a series of wrongs—the claim simply states that *at the time of approval of the lease*, the Secretary failed to consider the long-term return to the lessors. Because the purported wrong occurred only at one point in time, it is obviously not a continuing claim. In such case, the continuing claims doctrine is inapplicable. Because this claim accrued in 1964, it was not filed within six years following accrual and it is clearly time-barred by this court's statute of limitations.

For the latter half of this claim, however, the continuing claim doctrine is applicable because the claim can be broken down into a series of independent wrongs, *i.e.*, the failure every five years to adjust rental amounts. *See Brown Park*, 127 F.3d at 1456. Thus, under the lease, rental adjustments were due on July 1 of the following years: 1969, 1974, 1979, and 1984. Because the lease ended on June 30, 1989, the last adjustment to the rental would have been made in 1984. Lessors' latest claim, if any, would have accrued, under the continuing claim doctrine, on July 1, 1984; however, 1984 is not within six years of the filing of this claim on February 7, 1991. Therefore, we hold that the claim remains time-barred by the statute of limitations.

**(b) Failure to State a Claim—Count 4**

Lessors argue that the government's breach in this claim resulted from its failure to comply with 25 C.F.R. §§ 162.5(b) and 162.8. We will first analyze the lessors' claim that the Secretary inappropriately approved the lease for a term of 25 years despite the fact that the lease was for "valu-

able, commercially developable lands in an area that was developing rapidly."

■ Section 162.5(b), *supra*, of the regulations forbids the approval of a lease for less than the "present" fair annual rental, unless specifically excepted by the regulation. The relevant provision of § 162.8, *supra*, states that approval shall be limited to the minimum duration that would allow the highest economic return to the lessors. These regulations, together, place a duty on the Secretary, when approving a lease, to consider the shortest length of time that would allow the highest return at present values to lessors, consistent with conservation objectives. If we assume that lessors' allegations are true—that the leased premises were in a rapidly-developing area—such factor may counsel strongly against a continuous lease of 25 years. Under that assumption, the Secretary may have breached his duty to consider such a factor, *i.e.*, the minimum duration, when approving the lease for 25 years, causing probable damage to the lessors and entitling them to a determination of appropriate monetary relief. Therefore, on this record, the lessors have stated a claim upon which relief may be granted.

■ As to the second half of this claim—that the Secretary failed to adjust the rental to take into account the changing economic value of the land—we do not see that lessors have stated a claim. As discussed above, § 162.5(b) considers only the Secretary's duty upon approving a lease, thus is inapplicable to this claim of failure to adjust contract rental values. On the other hand, § 162.8(a) requires that leases contain provisions for periodic review of the rental amount to consider the "equities involved." 25 C.F.R. § 162.8(a). The regulation states that this review is required "unless the consideration for the lease is based primarily on percentages of income produced by the land." *Id.* The lease, appended to the complaint, substantially incorporates this regulation.

On the facts as alleged in the complaint, the total rental on the premises was composed of a fixed ground rental and a percentage rental from the gross receipts of the golf course. It is unclear *from the complaint*, however, whether the total rental payment was composed *primarily* of the percentage rental. If we construe the facts in the plaintiffs' favor, as we are obliged to do, this claim stands a greater chance of survival if we assume that the percentage rental was *not* the primary component of the total rental. Under those facts, periodic review of the "equities involved" was required. Even so, the regulation does not specify an entity or a person required to perform the review. An interpretation finding *no duty* on the Secretary to perform such review is supported by the last sentence of § 162.8(a) which requires the approval of the Secretary if any adjustment of rentals is made as a result of review. A requirement that rental adjustments be approved by the Secretary would be pointless if the Secretary was *required* to perform the review. We conclude, therefore, that there is no duty placed *on the Secretary* by this regulation to perform a periodic review of rentals. Consequently, we hold that the lessors have failed to state a claim upon which relief can be granted.

5. *The Failure to Promptly Terminate the Lease Upon Being Informed of Lease Violations*

(a) **Statute of Limitations—Count 5**

Plaintiffs' final claim is that the United States breached its fiduciary duty when it failed to promptly terminate the lease upon learning that Pima had breached the lease. This claim, if any, first accrued when the government learned of a violation of a specific provision of the lease and then failed to take timely action to terminate the lease. At such time, the government breached its alleged trust responsibilities by failing to take action to terminate the lease, and the government's liability was fixed such that the lessors could have brought suit. Thus, it is critical that we determine when the government first learned or was notified of the initial lease violations alleged in the complaint. Such time marks the earliest point upon which the claim could have accrued, since it is after this time that the breach—failure to take reasonably timely action to terminate—would have occurred. Thus, if the alleged lease violations occurred *after* February 7, 1985, the government's failure to

terminate would have occurred after this date, and within the six-year limitations period. On the other hand, if the initial lease violation occurred prior to February 7, 1985, then the initial accrual might have occurred more than six years prior to the filing of the complaint and thus would be barred by the statute of limitations. The foregoing would bar this claim, unless, of course, it is a continuing claim. We shall address these two issues *seriatim.*

The Indian lessors allege that the threshold notice of a lease violation that should have caused the government to take prompt action to terminate the lease came when the Secretary "was provided with information *by late 1987* that the lessee ... was in substantial breach by virtue of its underreporting of gross receipts...." (2nd Am.Compl. ¶ 15(e)). Lessors have not alleged with particularity what comprised the 1987 notice. From our own perusal of the evidence, we believe lessors are referring to a December 10, 1987 letter from lessors to the BIA. In this letter, the lessors informed the BIA that, based on their independent audit, Pima was misrepresenting certain items of its gross receipts. The lessors authorized the BIA to initiate "show cause for cancellation" procedures. (DX–32). Assuming, without deciding, that Pima was in fact underreporting its gross receipts to the Indian lessors, this December 1987 letter constituted written notification to the government at the latest point in time that Pima was in possible breach of the lease. Because this notification (which allegedly should have caused the government to act timely to terminate the lease) occurred within the period of the statute of limitations, it logically follows that the alleged failure to terminate the lease promptly might have occurred within the prescribed period. Therefore, this portion of lessors' claim appears not to be time-barred,[4] and we so hold.

Alternatively, we also find that a notice of lease violations was within the constructive knowledge of the government since shortly after the inception of the lease. We come to this conclusion through several logical steps. The statutory basis of this last claim is 25 C.F.R. § 162.14, which states that "[u]pon a *showing* satisfactory to the Secretary that there has been a violation of the lease ... the lessee shall be served with notice ... to show cause why the lease should not be cancelled." (emphasis added). We interpret "the showing" to the Secretary to include not only those facts presented to the Secretary by a third-party, but also those facts that are known or should be known by the Secretary. This definition also encompasses all facts that are within the files of the government and its agents.

Next, we can conclude with some confidence that the government had knowledge of lease violations as soon as the first quarter of the lease had elapsed. First, the lease contained a requirement that certified statements of gross receipts were to be sent both to the lessors *and the Secretary.* Second, the Secretary, or an agent of the Secretary, approved and signed the lease. We thus infer knowledge of the lease requirements to the government by reason of this signature. This knowledge includes not only that the government was to receive certified statements of gross receipts, but also the proper form of the certified statements and the lease's definition of gross receipts. Third, we have previously established that proper certified statements of gross receipts were not received by the Tribe, an agent of the government, until April of 1987. Thus, the fact that Pima had not submitted certified statements of gross receipts until early 1987, violating the lease, was within the constructive knowledge of the government.

As we have stated earlier, this claim accrued when the government first learned of

---

4. We note here that the government did in fact initiate cancellation of the lease, demanding that Pima "show cause why this lease should not be cancelled," in a letter from the BIA to Pima dated December 16, 1988, one year after the above notification of alleged violations. This letter was later rescinded. The lease was never terminated, but the BIA refused, on May 15, 1990, to approve Pima's request to renew the lease. Because lessors' claim is that the government breached its fiduciary duty when termination did not occur promptly upon notice of violations, we make no determination whether the refusal to renew constituted a timely termination. We only hold that lessors' claim is properly filed in this court.

lease violations and failed to send a notice to the lessee to show cause why the lease should not be cancelled. We have established above that the government knew of lease violations as early as 1964, after the passing of the lease's first quarter. Additionally, the government failed to send a notice to show cause letter until December of 1988, which it later rescinded. Thus, this claim accrued in 1964, when the government not only knew of lease violations but also failed to send a notice to show cause. As this date is not within six years of the 1991 filing date, it is barred by the statute of limitations unless it is a continuing claim.

 The continuing claim doctrine is applicable to this claim, because it is susceptible to being broken down into a series of independent wrongs. This claim closely resembles pay claims against the government, a frequent source for continuing claims caselaw, in which the Supreme Court held that a separate cause of action arises at each installment when an installment obligation is missed. *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of California,* 522 U.S. 192, 118 S.Ct. 542, 552, 139 L.Ed.2d 553 (1997). Thus, a plaintiff can only sue when liability arises upon the occurrence of the wrong at each installment. Similarly, in this case, a wrong arose each quarter when Pima violated the lease by failing to submit the required statements and the government failed to send a notice to show cause to Pima. A claim thus accrued at each quarter, starting from the first quarter in 1964, until April 1987 when the first proper certified statement of gross receipts was received by the government. Under the continuing claim doctrine, those claims that accrued within the six-year statute of limitations are saved and are properly here. Thus, the lessors' claim that the government failed to initiate termination proceedings in a timely fashion survive only as to those wrongs that occurred after February 7, 1985, the outer boundary of the limitations period for this action. Because some of the wrongs occurred after this date, we hold that such lessors' claim(s) are not time-barred.

**(b) Failure to State a Claim—Count 5**

 The Indian lessors charge in this claim that the government breached its trust obligations arising from its duty under 25 C.F.R. § 162.14. This regulation provides that:

> Upon *a showing satisfactory to the Secretary* that there has been a violation of the lease or the regulations in this part, the *lessee shall be served* with notice setting forth in detail the nature of the alleged violation and allowing him ten days from the date of receipt of the notice in which to show cause why the lease should not be cancelled.

(emphasis added). That section further provides that if the lessee fails to furnish satisfactory reasons in response to such notice, he shall be notified of the cancellation of the lease. *Id.* Reading this provision carefully, we find that it leaves to the Secretary's discretion the determination of whether the quantum of proof of a lease violation is sufficient to warrant cancellation proceedings. If the Secretary is satisfied that there has been lease or regulatory violations, a notice to show cause shall be sent. The Secretary's exercise of the discretion granted in this provision, however, is reviewable.

Where a trust relationship exists, as here, we review the Secretary's exercise of discretion to determine whether it conforms to fiduciary standards. The 10th Circuit has described, under similar circumstances, its standard of review of an agency's discretion when it operates as a trustee for Indians: "[T]he Secretary's *discretion* to approve or disapprove leases and communitization agreements must be governed by fiduciary standards and limited by fiduciary duties." *Cheyenne–Arapaho Tribes of Oklahoma v. United States,* 966 F.2d 583, 589 (10th Cir. 1992) (emphasis added), cited in *Cheyenne–Arapaho Tribes of Oklahoma v. United States,* 33 Fed.Cl. 464, 468 (1995). In *Cheyenne–Arapaho,* an Indian tribe sued the government under a breach of fiduciary duty theory. The governing statute and regulations required cooperative agreements to be approved by the Secretary but they specifically left the decision whether to approve the agreements to the Secretary's discretion,

providing no guidance regarding the exercise of this discretion. *Id.* at 588. The Court of Appeals provided the standard by which it would review the exercise of discretion by stating that the Secretary "must manage Indian lands so as to make them profitable for the Indians. As a fiduciary for the Indians, therefore, the Secretary is responsible for overseeing the economic interests of Indian lessors, and has a duty to maximize lease revenues." *Id.* (quoting *Gray v. Johnson*, 395 F.2d 533, 536 (10th Cir.1968)). Under such circumstances, the Secretary's actions will be analyzed not merely under an abuse of discretion standard, but under the more stringent standards demanded of a fiduciary. *Id.* at 591. This standard includes "administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property." Restatement (Second) of Trusts §§ 169–185 (1959). Thus, once a duty is placed on the Secretary to exercise discretion, a court must determine whether it was exercised in the economic interest of the Indians so as to maximize lease revenues. We turn now to the allegations in this claim.

Lessors allege that Pima violated the lease by failing to submit certified statements and underreporting its gross receipts. Assuming these facts as true, the lessors have alleged a violation of the lease. The lease (¶ 14(d)(5)) requires certified statements to be submitted every quarter. It also defines the components of gross receipts, which includes membership fees. The underreporting of gross receipts in this lease purportedly occurred because Pima failed to include 100% of membership fees as required under the lease (¶ 14(d)(1)). These allegations sufficiently establish a lease violation. The fact that Pima underreported its gross receipts was definitively confirmed in late 1987, notwithstanding any suspicions the lessors or the government may have had regarding lease violations at an earlier time. Thus it was in late 1987 that the lessors contend the Secretary received notice of lease violations. They allege that no action was taken until 1990, nearly three years after the lease violations were brought to light. Because the facts as alleged by the lessors could indicate a failure to exercise the care that a reasonable person

would exercise on his own behalf and a failure to maximize lease revenues, lessors have stated a claim upon which relief can be granted. Therefore, lessors are entitled to offer proof that the Secretary failed to prudently exercise his discretion in determining whether sufficient lease violations had occurred warranting the initiation of cancellation procedures.

## C. NECESSARY AND INDISPENSABLE PARTY

The final ground advanced in the government's motion to dismiss is that the lessors failed to join the Salt River Pima–Maricopa Indian Community (the Tribe), who had administered the lease since 1975, as a necessary and indispensable party as required under RCFC 19. For the reasons explained below, we conclude that the Tribe is *not* a necessary and indispensable party to this action. Therefore, lessors' complaint may not be dismissed on this basis.

The determination of whether a party is necessary and indispensable to an action under RCFC 19 is a two-step analysis, inasmuch as the operative requirements are in the conjunctive. First, the court must determine whether a party is "necessary" under RCFC 19(a). A "necessary" party must be joined in the action if it is feasible to do so. *Id.* If the party cannot be joined in the action, then the court must determine "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." RCFC 19(b). Thus, the court first should determine whether the party is necessary to an action before it can ultimately determine whether the party is indispensable. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

To determine if a party is "necessary," Rule 19(a) provides:

[A] person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if: (1) in the person's

absence complete relief cannot be accorded among those already parties; or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the person's claimed interest.

RCFC 19(a).

Under the first test of Rule 19, a party will be found necessary if "in the person's absence complete relief cannot be accorded among those already parties." RCFC 19(a)(1). The government argues that, in order for lessors to prove breach of fiduciary duties by the government, they must first prove that the Tribe has failed to comply with the terms of its management contract under which it managed this lease since 1975. This is inaccurate. Even assuming that the Tribe did in fact fail to comply with its management contract causing the government to be in breach of its fiduciary duties, lessors do not need to *join* the Tribe as a party in order to get relief. Joinder is not required because the lessors may attempt to prove the Tribe's breach through appropriate discovery mechanisms. As will be shown below, a party is not "necessary" for the sole reason that the plaintiff needs to obtain evidence from it. *Costello Publishing Co. v. Rotelle,* 670 F.2d 1035, 1044 (D.C.Cir.1981).

In a similar vein, the government further asserts that this court must find the Tribe to be a necessary party because much of the information it needs to defend itself, in the form of documents, letters, records of telephone calls, etc., is in the possession of the Tribe. In effect, the government maintains, it would be forced to defend the actions of another entity without that entity's presence at trial. As the Court of Appeals for the District of Columbia Circuit has noted:

The question of whether or not an entity or individual should be a party to an action is something quite different from the questions and problems associated with obtaining evidence from such an entity or indi-

vidual. Rule 19 ... does not list the need to obtain evidence from an entity or individual as a factor bearing upon whether or not a party is necessary or indispensable to a just adjudication.

*Costello Publishing,* 670 F.2d at 1044. Thus, on this record, we cannot conclude that the Tribe is a necessary party under Rule 19 on the basis of potential discovery difficulties that the government might encounter.

Second, the Indian Self–Determination and Education Assistance Act allows persons to recover from the United States for claims arising out of self-determination contracts authorized by the Act, such as the management contract between the Tribe and the BIA. Pub.L. No. 101–512, Title III, § 314, 104 Stat.1959 (1990) (codified as amended at 25 U.S.C. § 450f notes (1993)). That section provides:

With respect to claims resulting from the performance of functions ... under a contract, grant agreement, or any other agreement or compact authorized by the Indian Self–Determination and Education Assistance Act of 1975 ... an Indian tribe, tribal organization or Indian contractor is deemed hereafter to be part of the Bureau of Indian Affairs in the Department of Interior ... while carrying out any such contract or agreements and its employees are deemed employees of the Bureau ... while acting within the scope of their employment in carrying out the contract or agreement: Provided, That ... any civil action or proceeding involving such claims brought hereafter against any tribe, tribal organization, Indian contractor or tribal employee covered by this provision shall be deemed to be an action against the United States and will be defended by the Attorney General and be afforded the full protection and coverage of the Federal Tort Claims Act.

*Id.* Thus, a claim against the Tribe for mismanagement of the lease would be deemed by law, on this record, to be a suit against the United States. Given the foregoing, joinder of the Tribe as a third party is, therefore, unnecessary and redundant.

Finally, the government is the only party subject to liability for *breach of fiduciary*

*duty* because only the government is a trustee, not the Tribe. The government's trust responsibilities are not abrogated under the Indian Self–Determination Act when the government contracts its functions to Indian tribes. 25 U.S.C. § 450n; 25 C.F.R. § 271.1(c). Thus the government is the sole fiduciary and remained the sole fiduciary even when the Tribe undertook the government's functions under the lease. The presence and inclusion of the Tribe as a party in this suit is, therefore, not necessary to determine the liability, if any, of the government as a fiduciary to the Indian lessors.

Under the second test for finding a party to be "necessary," a party must be joined if feasible pursuant to Rule 19(a) if that party claims an interest relating to the subject of the action and (i) the protection of that interest will be impaired or impeded if the action proceeds in the party's absence or (ii) those already parties will be subject to a substantial risk of incurring multiple or inconsistent obligations. RCFC 19(a)(2). In the instant case, we find that the Tribe does not claim an interest in this litigation. The Tribe is not a party to the lease at issue in this matter. Nor is the Tribe a party to the trust relationship between the United States and the individual landholders.

The government maintains that the Tribe does have an interest in this action because it may be subject to possible action from the government, for instance a suit by the government for indemnification or the cancellation of their management contract with the BIA. These arguments are void of merit. The government is alleging that the Tribe has an interest in possible consequences that *may* result from this litigation. Those interests are not interests in the case at bar, which is a suit for breach of trust, but rather interests in potential future litigation. Thus, the Tribe does not have an interest in the outcome of the *present* litigation that will be prejudiced if this case proceeds in its absence.

Because the court concludes that (i) complete relief can be accorded among the existing parties, (ii) the government's ability to defend itself is not impaired in the Tribe's absence, and (iii) the Tribe has no substantial interest in the present litigation, the Tribe, under Rule 19(a), is not a necessary party. Further analysis of whether the Tribe is an indispensable party is, therefore, moot, inasmuch as the indispensable element is in the conjunctive. Assuming, *arguendo*, that the Tribe was a necessary party, the court would next need to determine whether, if the Tribe cannot feasibly be joined,[5] the action can proceed in its absence.

The court considers four factors under Rule 19(b) in determining whether this action should, in equity and good conscience, be dismissed in the absence of the Tribe. "These four factors are not rigid, technical tests, but rather guides to the overarching equity and good conscience determination." *Wichita & Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 774 (D.C.Cir.1986). These factors are:

> (1) to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measure, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

RCFC 19(b). After a careful analysis of the four factors delineated in Rule 19(b), we hold that the Tribe is not an indispensable party to the instant action.

The first consideration is the extent to which "a judgment rendered in the person's absence might be prejudicial to the person or those already parties." RCFC 19(b)(1). The government argues first that it would be prejudiced by a judgment rendered in the Tribe's absence. Without the Tribe, the government claims that it would be forced to

---

**5.** The government asserts that, because of the Tribe's sovereign immunity, it cannot feasibly be joined. The court need not reach a determination of whether the Tribe can properly invoke sovereign immunity. Even if sovereign immunity were available to the Tribe, and the Tribe did not waive it, for the reasons discussed below, this court has determined, in equity and in good conscience, that the action should still proceed in the Tribe's absence.

defend the actions of another entity, requiring evidence in the possession of the Tribe. As noted above, however, the need to obtain evidence from an entity is not a factor in determining whether a party is necessary or indispensable. *Costello Publishing*, 670 F.2d at 1044. Thus, a judgment rendered in the absence of the Tribe would not be prejudicial to the government.

Moreover, such a judgment would not prejudice the Tribe as the government contends. Because the lease involved in this dispute is related to the activities of the Tribe, the government asserts that the Tribe would be prejudiced if the contract were subject to later cancellation. In this regard, the government cites *McClendon v. United States*, 885 F.2d 627 (9th Cir.1989), where an Indian tribe was declared an indispensable party based on the fact that the tribe was a *party to a lease* agreement which plaintiffs sought to have judicially enforced. That case, however, is distinguishable from the matter at bar on several bases. First, the Salt River Pima–Maricopa Indian Community is a party neither to the lease at the center of this dispute nor, more importantly, to the alleged trust relationship between the United States and lessors. Secondly, plaintiffs, in the case at bar, are not seeking injunctive enforcement of a lease, but rather money damages for an alleged breach of fiduciary duty. Thus, *McClendon* is inapposite, and the Tribe would not be prejudiced in any legally-cognizable interest by a judgment rendered in their absence. Therefore, we find no risk of prejudice of the type contemplated by Rule 19(b)(1). This first factor under Rule 19(b), then, points to a finding that the Tribe is not an indispensable party in this action.

Because there would be no prejudice to the legally-cognizable interests of the parties and the Tribe by a judgment rendered in the Tribe's absence, we need not consider the second factor under Rule 19(b), which focuses on "the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided." RCFC 19(b)(2). Since we find no prejudice to mitigate, we find that it may be avoided entirely. Again, the indispensable party analysis prescribed by Rule 19(b) supports a finding that the Tribe is not an indispensable party.

Turning to the third factor, the court must consider whether "a judgment rendered in the person's absence will be adequate." RCFC 19(b)(3). Lessors in this action have prayed for a *money judgment* against the United States. A judgment rendered by this court, even in the Tribe's absence, would thus be adequate to accord lessors *the relief they seek*. Therefore, the third factor listed in Rule 19(b) points in favor of a finding that the Tribe is not an indispensable party.

Finally, this court must inquire "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder." RCFC 19(b)(4). Courts will endeavor to avoid declaring a party indispensable if the plaintiff would have no alternative remedy upon dismissal. *Wichita & Affiliated Tribes*, 788 F.2d at 777. If this action were dismissed for nonjoinder, lessors might have a potential claim against the Tribe. Any such suit, however, would likely be barred by the Tribe's sovereign immunity. It is also likely that lessors might have a remedy for breach of the lease against Pima Country Club. Thus, it is uncertain whether lessors in this suit would or would not have an alternative adequate remedy if this suit were dismissed. Consequently, the fourth and final factor in the court's analysis under Rule 19(b) is not clearly indicative of whether the Tribe is or is not an indispensable party to the case at bar. The other three factors clearly indicate that the Tribe is not an indispensable party. In light of all of the foregoing factors, we hold that the Tribe is not an indispensable party to this action. Therefore, this action may proceed in equity and good conscience without the joining of the Tribe as a party to this suit.

Because the Tribe is neither a necessary nor an indispensable party, the government has failed to demonstrate any legitimate reason why the Tribe must be joined in this suit. As a result, the government's motion to dismiss for failure to join a necessary and indispensable party must be denied on this ground.

## CONCLUSION

In this case, the plaintiff-lessors filed a five-count complaint for relief due to the government's alleged violation of certain specific fiduciary duties. The government's motion to dismiss challenged each of the five counts on two separate grounds—(i) the statute of limitations as a time bar and (ii) failure to state a claim upon which relief can be granted. Additionally, the government's motion to dismiss challenged the entire complaint for failing to join a necessary and indispensable party.

First, with respect to the government's challenge on the basis of the statute of limitations to each count, we GRANT the motion to dismiss as to counts—(i) for failure to require statements of gross receipts; (ii) for failure to determine if gross receipts were accurate; (iii) for failure to require evidence of insurance; and (iv) for approval of the lease without considering the highest return and failure to periodically adjust rentals. We DENY the motion to dismiss for violation of the statute of limitations as to count (v) for failure to promptly terminate the lease.

With respect to the government's challenge to each count on the basis of the failure to state a claim upon which relief can be granted, we GRANT the motion to dismiss as to counts—(i) for failure to require statements of gross receipts; (ii) for failure to determine if gross receipts were accurate; (iii) for failure to require evidence of insurance; and the second half of count (iv) for failure to periodically adjust rentals. We DENY the motion to dismiss for failure to state a claim as to the first half of count (iv) for approval of the lease without considering the highest return, and count (v) for failure to promptly terminate the lease.

Secondly, because the Tribe is not a necessary party to this action, the government's motion to dismiss for failure to join a necessary and indispensable party is hereby DENIED.

WHEREFORE, there being no just reason for delay, pursuant to RCFC 54(b), the Clerk shall enter judgment as to the above rulings accordingly.

Given all of the foregoing, the only count remaining for trial is count (v) for failure to promptly terminate the lease, and this court hereby implements the following pretrial schedule in that regard:

1. All discovery shall be completed within 45 days, *i.e.*, by January 22, 1999.

2. The parties shall comply with paragraph 10 of Section V of Appendix G by February 5, 1999.

3. Plaintiff shall comply with paragraphs 11–13 * of Section V of Appendix G on or before February 19, 1999.

4. Defendant shall comply with paragraphs 11–13 * of Section V of Appendix G on or before March 16, 1999.

5. The parties shall comply with paragraphs 14–15 of Section V of Appendix G on or before March 16, 1999.

As to paragraph 14 (Stipulations), the joint memorandum shall be in two parts:

a. The first part shall contain separately numbered paragraphs covering all matters to which the parties have stipulated during the course of the proceedings. The stipulations must be comprehensive and the fact that any matter may have been established during discovery by admission or otherwise is not grounds for omitting it from stipulation. A party may not refuse to stipulate as to the content or purport of a document simply by claiming that the document is the best evidence of its content. Nor is the fact that a party deems a fact irrelevant a sufficient basis for refusing to stipulate to its existence. Relevancy may be argued in the Memorandum of Contentions of Fact and Law.

b. The second part of the memorandum shall set forth any matters a party proposes to be stipulated, as to which the parties have failed to reach agreement, and which the proponent of the stipulation believes are not reasonably subject to dispute. Each such proposed stipulation shall be set forth in full, together with the reasons the proponent be-

---

* Witnesses shall be characterized as fact, expert, or fact/expert. The anticipated length of the trial and requested trial location shall also be stated.

The parties are not required to file proposed findings of fact (paragraphs 11(a) and 11(b)).

lieves the matter is not subject to dispute. The opposing party must explain beneath why and to what extent it believes the matter to be in dispute.

6. If contemplated, the parties shall comply with paragraph 16 of Section V of Appendix G on or before March 16, 1999.

7. The pretrial conference shall be held at 10:00 a.m. on April 6, 1999, at the Howard T. Markey National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005. The exact courtroom location will be posted in the lobby at that time. The trial date and location will be set at this conference.

IT IS SO ORDERED.